UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CASEY TAYLOR, et al., | CASE NO. C11-1289JLR |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND RESERVING RULING IN PART |
| v. | |
| BURLINGTON NORTHERN RAILROAD HOLDINGS, INC., et al., | |
| Defendants. | |

## I.   INTRODUCTION

Before the court is Defendants Burlington Northern Railroad Holdings, Inc., and BNSF Railway Company's (collectively, "BNSF") motion for summary judgment.  (Mot. (Dkt. # 29); *see also* Resp. (Dkt. # 31); Reply (Dkt. # 33).)  Plaintiff Casey Taylor and his wife, Plaintiff Angelina Taylor, allege that BNSF unlawfully discriminated against Mr. Taylor by refusing to hire him because (1) BNSF perceived Mr. Taylor as being disabled and (2) Mr. Taylor is a veteran.  (*See* Not. of Rem. (Dkt. # 1) at 7-12 ("Compl.") at 5.)

1  BNSF seeks dismissal of the Taylors' claims.  (*See* Mot at 1-2.)  Having reviewed

2  BNSF's motion, all submissions filed in support of and opposition to the motion, the

3  balance of the record, and the relevant law, the court GRANTS the motion in part and

4  RESERVES RULING on it in part as set forth below.

5  ## II.  BACKGROUND

6      On June 27, 2007, Mr. Taylor applied to work for BNSF in the position of

7  Electronic Technician.  (Pierce Decl. (Dkt. # 30) ¶ 2, Ex. A ("Application") at 1.)  Mr.

8  Taylor was then nearing the end of a five-year term of service in the United States Marine

9  Corps, where he worked as an avionics technician.  (*See id.* at 2-3 (stating the ending date

10  of Mr. Taylor's service as September 2007); Stephens Decl. (Dkt. # 32) ¶ 2, Ex. 1

11  ("Taylor Dep.") at 10:13-15, 12:7-11, 15:8-12 (noting that Mr. Taylor received an

12  honorable discharge),[1] 19:19-20:2.)  He listed his Marine Corps service as his most recent

13  work experience.  (Application at 2.)  On October 29, 2007, BNSF extended a conditional

14  job offer to Mr. Taylor for the Electronic Technician position.  (Taylor Dep. at 22:17-21;

15  Pierce Decl. ¶ 5, Ex. D ("Cond. Offer").)

16      In view of safety considerations associated with the position, BNSF conditioned

17  Mr. Taylor's offer in part on a successful medical screening.  (*See* Cond. Offer at 1

18  ("[T]his offer is contingent on the favorable outcome of a pre-employment background

19  screening, consisting of the following: physical examination . . . and our receipt and

20  review of a completed BNSF medical history questionnaire.  Failure of any portion of our

21  _____

22      [1] The application to work at BNSF asked whether Mr. Taylor had been dishonorably
discharged.  (Application at 3.)  Mr. Taylor responded in the negative.  (*Id.*)

background screening will result in this conditional offer being rescinded."); Mot. at 1-3, 13-15.)[2]  On October 29, 2007, Mr. Taylor submitted a completed medical questionnaire to Comprehensive Health Services ("CHS"), BNSF's outside medical contractor.  (Pierce Decl. ¶ 6, Ex. E ("Med. Questionnaire") at 2-8; *see also* Stephens Decl. ¶ 4, Ex. 3 ("1st Jarrard Dep.") at 29:12-14; Cond. Offer at 1.)  He listed his height as 5'7" and his weight as 250 pounds.  (Med. Questionnaire at 2.)  He disclosed that he experienced back pain and had been diagnosed with or treated for bursitis in his knee as a result of Marine Corps physical training.  (*Id.* at 5; *see also id.* at 3 ("Did you contract any illness or were you injured during military service, and as a result, you intend to apply for a Veteran's Administration Disability Rating?  Yes. . . . Ringing in ears, back pain, knee pain, foot pain, TMJ.").)  Otherwise, he answered most questions on the questionnaire in the negative and described his health as, in general, "Excellent."  (*Id.* at 7.)

On November 2, 2007, Eileen Henderson of CHS spoke to Mr. Taylor about his medical information.  (*See* Stephens Decl. ¶ 13, Ex. 12 ("Clinical Notes").)  She confirmed his self-reported height and weight and gathered additional information about his back and knee issues.  (*Id.*)  Mr. Taylor reported to Ms. Henderson that he had no current problems with his back or knees, and Ms. Henderson requested Mr. Taylor's medical records.  (*See id.* (requesting records regarding Mr. Taylor's back and knees); Pierce Decl. ¶ 8, Ex. G ("Henderson Emails"); Taylor Dep. at 27:19-22 ("As I recall, she

---

[2] The conditional offer required Mr. Taylor to complete this process within 30 days or by the date "this position is to begin work – whichever is sooner."  (Cond. Offer at 1.)  Mr. Taylor was to begin work on November 26, 2007.  (Stephens Decl. ¶ 20, Ex. 19.)

1    was actually just wanting everything that I had in my military record.").)  On November

2    6, 2007, Mr. Taylor contacted Ms. Henderson again to let her know that he was

3    requesting his medical records from the Veterans Administration ("VA") but was unsure

4    how long he would have to wait.  (*See* Henderson Emails at 1; Taylor Dep. at 27:19-28:2,

5    28:16-29:5.)

6          Mr. Taylor underwent a medical examination with CHS on November 5, 2007.

7    (*See* Stephens Decl. ¶ 20, Ex. 19 ("Physician Opinion"); *see also id.* ¶ 14, Ex. 13 ("IPCS

8    Results"); *id.* ¶ 15, Ex. 14 ("Vision Eval."); Clinical Notes.)  He passed a physical

9    capacities ("IPCS") test[3] that indicated he had adequate shoulder and knee strength.  (*See*

10   IPCS Results; 1st Jarrard Dep. at 32:18-33:10.)  A blood pressure test revealed normal

11   results.  (*See* Vision Eval.; 1st Jarrard Dep. at 75:8-24.)  His height and weight

12   measurements changed slightly from the self-reported values, however, resulting in a

13   body mass index ("BMI") that increased from 39.2 to 41.3.  (*See* Pierce Decl. ¶ 7, Ex. F

14   ("Referral") (listing Mr. Taylor's measured height as 5'6" and measured weight at 256

15   pounds).)  Because of his elevated BMI, CHS referred his medical examination results to

16   BNSF's medical department.  (*See id.*; 1st Jarrard Dep. at 40:9-14; Clinical Notes at 1

17   ("exam cleared . . . exam bmi 41.3 . . . pending MRs, will defer to BNSF Medical for

18   review" (omissions in original)).)  CHS's referral also noted that Mr. Taylor's medical

19   records were not currently available.  (*See* Referral at 1.)

20

21   ───────────────

22         [3] This test takes its name from the company that invented it—Industrial Physical
     Capacity Solutions.  (*See* 1st Jarrard Dep. at 10:22-11:3.)

1    BNSF medical officer Dr. Michael Jarrard reviewed Mr. Taylor's file on

2   November 7, 2007.  (*See* 1st Jarrard Dep. at 31:11; Resp. at 10; Pierce Decl. ¶ 10, Ex. I

3   ("Jarrard Email").)  That afternoon he sent an internal email containing the text of a letter

4   that would be sent to Mr. Taylor the next day.  (*See* Jarrard Email; Pierce Decl. ¶ 9, Ex. H

5   ("11/8 Letter").)  The letter informed Mr. Taylor that BNSF was "unable to determine

6   medical qualification . . . due significant health and safety risks associated with extreme

7   obesity ([BMI] near or above 40) and uncertain status of knees and back."  (11/8 Letter;

8   *see also* Jarrard Email.)  The letter further explained that Mr. Taylor could "permit

9   further evaluation" of his "health status and risks" by submitting (1) a sleep study, (2) a

10  medical report from a doctor documenting various "cardiac risk factors," including

11  fasting lipid profile and fasting blood sugar level, (3) an exercise tolerance test, (4) hip

12  and waist measurements performed by a physician's office or athletic facility, and (5) the

13  complete VA disability determination once it became available.  (11/8 Letter; *see also*

14  Jarrard Email.)  Alternatively, Mr. Taylor could be considered for the job if he lost 10%

15  of his weight and maintained that weight loss for at least six months.  (11/8 Letter; *see*

16  *also* Jarrard Email.)  BNSF did not offer to pay for any of the listed tests, and Mr. Taylor

17  could not afford them.  (*See* 11/8 Email; Stephens Decl. ¶ 5, Ex. 4 ("2d Jarrard Dep.") at

18  31:24-32:17; Taylor Dep. at 35:14-36:4, 37:15-24.)

19    Dr. Jarrard testified that he wanted this information because Electronic Technician

20  is safety-sensitive position.  (*See* 2d Jarrard Dep. at 29:13-30:22; *see also id.* at

21  23:11-25.)  According to Dr. Jarrard, a high BMI is a risk factor for certain health

22  conditions, such as sleep apnea, that could create safety risks if they developed in person

1    holding such a position.  (*See* 1st Jarrard Dep. at 46:19-47:3, 49:2-50:1; 2d Jarrard Dep.

2    at 23:11-25, 29:13-30:22, 59:16-60:24.)  Dr. Jarrard did not believe that Mr. Taylor had

3    such conditions, only that he was prone to developing them.  (*See* 1st Jarrard Dep. at

4    49:2-17, 86:4-25; 2d Jarrard Dep. at 30:7-22, 44:14-45:4, 59:16-60:24; Resp. at 18.)

5         Mr. Taylor was not hired for the Electronic Technician position, and on February

6    8, 2008, he filed a discrimination charge with the Equal Employment Opportunity

7    Commission ("EEOC").  (Stephens Decl. ¶ 26, Ex. 25 ("EEOC Charge").)  On March 27,

8    2008, BNSF responded to that charge in a letter to the EEOC.  (Stephens Decl. ¶ 29, Ex.

9    28 ("Resp. to EEOC").)  BNSF denied discriminating against Mr. Taylor and explained

10   to the EEOC that "Mr. Taylor's conditional offer of employment was rescinded due to

11   evidence of significant risk associated with extreme obesity and uncertain status of knees

12   and back."  (*Id.* at 1 ("These conditions posed a safety risk to Mr. Taylor and to others.

13   Therefore, Mr. Taylor's conditional offer of employment was rescinded.").)[4]  On August

14   25, 2010, the Taylors filed the present lawsuit.  (*See* Compl. at 6.)

15        The Taylors bring two types of discrimination claims against BNSF.  First, they

16   allege that BNSF discriminated against Mr. Taylor based on BNSF's perception that he

17   was disabled.  (*See id.* at 4-5.)  The Taylors argue that BNSF perceived Mr. Taylor as

18   disabled due to morbid obesity and knee and back problems.  (Resp. at 14-15 ("BNSF

19   perceived Casey Taylor was disabled based on his morbid obesity and knees and back."

20   (emphasis omitted)); *see also id.* at 17-18.)  Second, the Taylors allege that BNSF

21   _____

22   [4] BNSF now asserts that it did not rescind Mr. Taylor's offer but rather did not hire Mr.
     Taylor because he failed to provide requested medical information.  (*See, e.g.*, Mot. at 2, 6.)

ORDER- 6

1   discriminated against Mr. Taylor on the basis of his status as a veteran.  (*See* Compl. at 5;

2   Resp. at 23-24.)  Although federal statutes might cover these types of claims, the Taylors

3   bring their claims under the Washington Law Against Discrimination ("the WLAD"),

4   RCW ch. 49.60.  (Resp. at 9 n.70 ("Although [Mr.] Taylor filed a Charge of

5   Discrimination with the EEOC, he is not pursuing federal claims, which in this case

6   would have been brought under the ADA [Americans with Disabilities Act].  His claims

7   are being exclusively brought under [the WLAD]."); *see also id.* at 23-24 (failing to cite

8   the federal Uniformed Services Employment and Reemployment Rights Act in discussing

9   Mr. Taylor's veteran-status discrimination claims).)[5]

10       BNSF filed the instant motion for summary judgment on December 15, 2015.

11   (Mot. at 1.)  In its motion, BNSF asks the court to dismiss the Taylors' disability

12   discrimination claim because obesity is not a disability unless caused by a physiological

13   disorder, and BNSF did not perceive Mr. Taylor as having a disability related to obesity.

14   (*See id.* at 6-11.)  BNSF also argues that the Taylors' veteran-status discrimination claim

15   should be dismissed because the Taylors lack evidence linking BNSF's failure to hire Mr.

16   Taylor to Mr. Taylor's status as a veteran.  (*See id.* at 16-18; Reply at 10-11.)  BNSF's

17   motion for summary judgment is now before the court.

18

19

20

21       [5] (*See also* Taylor MILs (Dkt. # 38) at 1-2 ("This case involves two (2) claims.  Both
    claims arise under the Washington Law Against Discrimination (WLAD).  The first claim is that
    Casey Taylor was perceived to have been disabled by the Defendants and denied employment.
    The second claim alleges that Mr. Taylor was not employed because he was a veteran and,
22   therefore, was discriminated against based on his veteran status.").)

ORDER- 7

1        III.    DISCUSSION

2    **A.    Legal Standard**

3        Summary judgment is appropriate if the evidence, when viewed in the light most

4    favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

5    any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

6    P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*,

7    477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing

8    there is no genuine issue of material fact and that he or she is entitled to prevail as a

9    matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden,

10    then the nonmoving party "must make a showing sufficient to establish a genuine dispute

11    of material fact regarding the existence of the essential elements of his case that he must

12    prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658. A fact

13    is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*,

14    477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient

15    evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods.*,

16    *Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

17        In determining whether the fact-finder could reasonably find in the nonmoving

18    party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

19    party, and it may not make credibility determinations or weigh the evidence." *Reeves v.*

20    *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Nevertheless, the

21    nonmoving party "must do more than simply show that there is some metaphysical doubt

22    as to the material facts . . . . Where the record taken as a whole could not lead a rational

1   trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v.*

2   *Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita*

3   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

4       The court may only consider admissible evidence when ruling on a motion for

5   summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).

6   "Legal memoranda and oral argument are not evidence and do not create issues of fact

7   capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682

8   F.2d 814, 819-20 (9th Cir. 1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d

9   1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot

10  defeat summary judgment.").

11  **B.    The Taylors' Claims**

12      The Taylors assert claims under the WLAD for discrimination on the basis of

13  perceived disability and Mr. Taylor's status as a veteran.  (*See* Compl. at 3-5.)  The

14  WLAD provides, in relevant part,

15      It is an unfair practice for any employer . . . [t]o refuse to hire any person
        because of . . . honorably discharged veteran or military status, or the
16      presence of any sensory, mental, or physical disability . . . unless based
        upon a bona fide occupational qualification: PROVIDED, [t]hat the
17      prohibition against discrimination because of such disability shall not apply
        if the particular disability prevents the proper performance of the particular
18      worker involved . . . .

19  RCW 49.60.180(1).  To prove discrimination under this provision a plaintiff must show

20  that his or her protected status was a substantial factor in the defendant's decision not to

21  hire the plaintiff.  *See id.*; *Hill v. BCTI Income Fund-I*, 23 P.3d 440, 446-49 (Wash. 2001)

22  ("[The] *ultimate* burden in cases brought under RCW 49.60.180 is to present evidence

1   sufficient for a trier of fact to reasonably conclude that the alleged unlawfully

2   discriminatory animus was more likely than not a substantial factor in the adverse

3   employment action." (emphasis in original)), *overruled in part on other grounds by*

4   *McClarty v. Totem Elec.*, 137 P.3d 844 (Wash. 2006).

5        In the absence of direct evidence of discriminatory intent, courts employ the

6   *McDonnell Douglas* burden-shifting framework to analyze discrimination claims at the

7   summary judgment stage. *See Riehl v. Foodmaker, Inc.*, 94 P.3d 930, 936-37 (Wash.

8   2004); *Hill*, 23 P.3d at 445-46 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

9   (1973)). Under this scheme, the plaintiff first must establish a prima facie case. *Anica v.*

10  *Wal-Mart Stores, Inc.*, 84 P.3d 1231, 1236 (Wash. Ct. App. 2004). The plaintiff's prima

11  facie case raises a presumption of discrimination and shifts the burden to the defendant to

12  show a legitimate non-discriminatory rationale for the employment decision. *Riehl*, 94

13  P.3d at 936-37. If the defendant offers such a rationale, the plaintiff must offer evidence

14  that the employer's rationale was actually a pretext for discrimination. *Id.*; *Anica*, 84

15  P.3d at 1236. These burdens are burdens of production, not persuasion. *Scrivener v.*

16  *Clark Coll.*, 334 P.3d 541, 546 (Wash. 2014); *Riehl*, 94 P.3d at 936-37.

17       To present a prima facie case, the plaintiff must produce evidence showing that (1)

18  the plaintiff belongs to a protected class, (2) the plaintiff was qualified for the job in

19  question, (3) the plaintiff was not hired, and (4) the adverse employment action occurred

20  under circumstances that raise a reasonable inference of unlawful discrimination. *See*

21  *Riehl*, 94 P.3d at 936; *Hill*, 23 P.3d at 446; *Anica*, 84 P.3d at 1236; *see also Hill* 23 P.3d

22  at 446 n.2 (noting that "[s]ince the facts will vary from case to case," the formulation of

1   the plaintiff's prima facie case may also vary); *Callahan v. Walla Walla Hous. Auth.*, 110

2   P.3d 782, 786 (Wash. Ct. App. 2005) ("The specifics of the prima facie case are

3   suggested by the particular form of discrimination alleged.").

4       1.  Disability discrimination

5       The Taylors claim that BNSF perceived Mr. Taylor as disabled due to (1) obesity

6   and (2) knee and back problems, and that those perceived disabilities were a substantial

7   factor in BNSF's decision not to hire Mr. Taylor.  (*See* Resp. at 2, 14-15, 17-18.)  The

8   court addresses each aspect of the Taylors' disability discrimination claim in turn.

9       *a.  Obesity*

10      Whether this aspect of the Taylors' disability discrimination claim can survive

11  depends on the status of obesity as a disability under the WLAD.  *See Callahan*, 110 P.3d

12  at 786 ("[T]he first thing an employee alleging disability discrimination must establish is

13  that she is disabled.").  BNSF argues that obesity is not a disability under the WLAD

14  unless the obesity is the result of a physiological disorder or condition.  (*See* Mot. at

15  6-10.)  Further, BNSF maintains that although it perceived Mr. Taylor as obese based on

16  his BMI results, it did not perceive him as obese due to a physiological disorder or

17  condition and therefore did not perceive him as disabled.  (*Id.* at 10-11.)  The Taylors

18  respond that BNSF has misinterpreted the WLAD's treatment of obesity as a disability

19  and that, under the correct interpretation, BNSF perceived Mr. Taylor as disabled.  (*See*

20  Resp. at 14-18 & nn.105-22.)  The court agrees with BNSF.

21      Under the WLAD, a "disability" is "the presence of a sensory, mental, or physical

22  impairment that: . . . [i]s perceived to exist whether or not it exists in fact."  RCW

1    49.60.040(7)(a).  An "'impairment' includes, but is not limited to: (i) [a]ny physiological

2    disorder, or condition . . . affecting one or more of the following body systems:

3    Neurological, musculoskeletal, special sense organs, respiratory, including speech

4    organs, cardiovascular, reproductive, digestive, genitor-urinary, hemic and lymphatic,

5    skin, and endocrine . . . ."  RCW 49.60.040(7)(c).  Although the Washington legislature

6    has directed courts to construe the WLAD's provisions liberally, RCW 49.60.020, neither

7    party suggests that the statutory language alone answers the question of whether and

8    under what circumstances obesity qualifies as a disability under the WLAD.  (*See* Resp.

9    at 14-18; Mot. at 6-11.)  Furthermore, BNSF indicates, and the court's own research

10   confirms, that no Washington case law addresses this issue.  (*See* Mot. at 8-10.)

11          In light of the absence of Washington law on this subject, the court turns for

12   guidance to the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et*

13   *seq.*, and the regulations and case law interpreting it.  Washington courts find this body of

14   law persuasive in interpreting the WLAD.  *See Davis v. Microsoft Corp.*, 70 P.3d 126,

15   132 (Wash. 2003); *Clarke v. Shoreline Sch. Dist. No. 412*, 720 P.2d 793, 803 (Wash.

16   1986) ("[W]hen Washington statutes or regulations have the same purpose as their

17   federal counterparts, we will look to federal decisions to determine the appropriate

18   construction."); *Fey v. State*, 300 P.3d 435, 452-53 (Wash. Ct. App. 2013).  Furthermore,

19   the definitions of disability and impairment are substantially the same in all relevant

20   respects under the WLAD and the ADA.  *See* RCW 49.60.040(7)(a), (c); 42 U.S.C.

21   §§ 12102(1) (defining "disability" to include "being regarded as having" a "physical or

22   mental impairment that substantially limits one or more major life activities"), (3)

1    (clarifying that an individual may be "regarded as" having an impairment "whether or not

2    the impairment limits or is perceived to limit a major life activity"); 29 C.F.R.

3    § 1630.2(h)(1) (defining physical impairment as "[a]ny physiological disorder or

4    condition, cosmetic disfigurement, or anatomical loss affecting one or more body

5    systems, such as neurological, musculoskeletal, special sense organs, respiratory

6    (including speech organs), cardiovascular, reproductive, digestive, genitourinary,

7    immune, circulatory, hemic, lymphatic, skin, and endocrine").

8           Several courts have addressed the question of whether and under what

9    circumstances obesity qualifies as a disability under the ADA, but those courts do not all

10   agree on the answer.  The majority have found that obesity is a disability only when it is

11   the result of a physiological condition or disorder.  Others, though, have concluded that

12   obesity is a disability when it stems from a physiological disorder or condition or when it

13   is sufficiently extreme, such as when the plaintiff's weight is (or is perceived as being)

14   100% greater than the norm.  Still others have suggested that obesity discrimination

15   claims may lie when the employer believes the plaintiff's weight constitutes a disability.

16   The court finds the majority position most persuasive.

17          As the EEOC explains in its guidance accompanying the ADA regulations, "It is

18   important to distinguish between conditions that are impairments and physical,

19   psychological, environmental, cultural, and economic characteristics that are not

20   impairments."  29 C.F.R. § 1630, App.  Thus, "the term 'impairment' does not include

21   physical characteristics such as eye color, hair color, left-handedness, or height, weight,

22   or muscle tone that are within 'normal' range and are not the result of a physiological

ORDER- 13

1  disorder." *Id.*  Consistent with this guidance and the definition of impairment, a majority

2  of the courts to address this issue have held that "to constitute an ADA impairment, a

3  person's obesity, even morbid obesity, must be the result of a physiological condition."

4  *E.E.O.C. v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 443 (6th Cir. 2006); *Francis v. City*

5  *of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997) ("[O]besity, except in special cases where

6  the obesity relates to a physiological disorder, is not a 'physical impairment' within the

7  meaning of the statutes."); *Andrews v. State of Ohio*, 104 F.3d 803, 808 ("Accordingly,

8  physical characteristics that are 'not the result of a physiological disorder' are not

9  considered 'impairments' for the purposes of determining either actual or perceived

10 disability."); *see also Cook v. State of R.I. Dep't of Mental Health, Retardation & Hosps.*,

11 10 F.3d 17, 20-21, 23 (1st Cir. 1993) (concluding that morbid obesity could be "physical

12 impairment" where the parties admitted that the plaintiff suffered from "morbid obesity"

13 and the plaintiff presented expert testimony "that morbid obesity is a physiological

14 disorder involving a dysfunction of both the metabolic system and the neurological

15 appetite-suppressing signal system"); *Merker v. Miami-Dade Cty.*, 285 F. Supp. 2d 1349,

16 1353 (S.D. Fla. 2007) ("Courts have uniformly held that obesity is not a qualifying

17 impairment, or disability, unless it is shown to be the result of a physiological disorder.");

18 *Coleman v. Ga. Power Co.*, 81 F. Supp. 2d 1365 (N.D. Ga. 2000) ("[W]hile obesity

19 generally is not considered an impairment it can be found to be an impairment in limited

20 circumstances where it is shown both to affect one of the bodily systems outlined in the

21 guideline definition for physical impairment and where such obesity is related to a

22 physiological disorder."); *cf. Tudyman v. United Airlines*, 608 F. Supp. 739, 746 (C.D.

ORDER- 14

1   Cal. 1984) (concluding that the plaintiff, a bodybuilder, did not suffer from weight-

2   related impairment because his "unique musculo-skelital [sic] system and body

3   composition" were not the result of a physiological disorder (internal quotation marks

4   omitted)).

5        The Taylors—and the cases they cite in support of their position—reject this line

6   of authority in part because it predates the 2008 amendments to the ADA.  (*See* Resp. at

7   15-17 & nn.112, 118); *Whittaker v. America's Car-Mart, Inc.*, No. 1:13CV108 SNLJ,

8   2014 WL 1648816, at *2 (E.D. Mo. Apr. 24, 2014); *Lowe v. Am. Eurocopter, LLC*, No.

9   1:10CV24-A-D, 2010 WL 5232523, at *6-8 (N.D. Miss. Dec. 16, 2010); *BNSF Ry. Co. v.

10  Feit*, 281 P.3d 225, 228-29 (Mont. 2012) (interpreting federal law in order to determine

11  the proper construction of an analogous Montana statute).  Yet neither the Taylors nor the

12  cases on which they rely persuasively articulate how the 2008 amendments to the ADA

13  altered the landscape regarding obesity under the ADA.  The cases point out that

14  Congress, in enacting the 2008 amendments, intended to liberalize courts' interpretation

15  of the term "disability."  *See, e.g.*, *Feit*, 281 P.3d at 228-30.  However, the specific issues

16  Congress addressed are tangential to the obesity-as-disability question.  *See Lowe*, 2010

17  WL 5232523, at *6-7 (citing Americans with Disabilities Act Amendments Act of 2008,

18  Pub. L. No. 110-325, 112 Stat. 3553, 110th Cong., 2d Sess. (Sept. 25, 2008) (effective

19  Jan. 1, 2009)) (explaining that the 2008 amendments altered the "substantially limits" and

20  "major life activities" portions of the definition of "disability").

21       Whether obesity is a disability turns on whether obesity is an "impairment."  *See,

22  e.g.*, *Watkins Motor Lines, Inc.*, 463 F.3d at 443.  The 2008 amendments had no effect on

1    the definition of impairment.  Indeed, as the EEOC observes in its guidance, "the

2    legislative history of the Amendments Act notes that Congress 'expect[s] that the current

3    regulatory definition of [physical or mental impairment] . . . will not change.'"  29 C.F.R.

4    § 1630, App. (first alteration in original) (discussing § 1630.2(h)).  As such, Congress's

5    general "directive for a broad construction of disability provides no justification to ignore

6    the definition's plain language or to ignore previous cases interpreting the definition."

7    *Feit*, 281 P.3d at 232 (Morris, J., dissenting); *see also Frank v. Lawrence Union Free*

8    *Sch. Dist.*, 688 F. Supp. 2d 160, 169 (E.D.N.Y. 2010) (following the majority position

9    without discussing the 2008 amendments); *Morris v. BNSF Ry. Co.*, No. 8:13CV24, 2014

10   WL 6612604, at *2-3 (D. Neb. Nov. 20, 2014) (same).[6]

11          The Taylors next attempt to undermine the majority position by interpreting the

12   EEOC guidance cited above[7] to mean that weight is an impairment when it is outside the

13   normal range.  (*See* Resp. at 16-17 (citing *Feit*, 281 P.3d at 229)); *see also E.E.O.C. v.*

14   *Res. for Human Dev., Inc.*, 827 F. Supp. 2d 688, 693-95 (E.D. La. 2011).  The court finds

15   that a more sensible interpretation of the EEOC's guidance is that "a person's weight can

16   _____

17          [6] For the same reasons, the court finds unpersuasive the Taylors' parallel argument
     regarding the liberalizing effect of the 2007 amendments to the WLAD.  (*See* Resp. at 14-16 &
18   n.106.)  The 2007 WLAD amendments altered some aspects of the definition of disability but
     also adopted a definition of impairment that is substantially the same as the federal definition of
19   impairment.  (*See id.*); RCW 49.60.040(7)(a), (c); 2007 Wash. Legis. Serv. Ch. 317 (S.S.B.
     5340) (West); 29 C.F.R. § 1630.2(h)(1); *Hale v. Wellpinit Sch. Dist. No. 49*, 198 P.3d 1021,
20   1022-25 (Wash. 2009).  As discussed above, the definitions of disability and impairment under
     state and federal law are now substantially the same in all respects relevant to this case.

21          [7] "[T]he term 'impairment' does not include physical characteristics such as eye color,
     hair color, left-handedness, or height, weight, or muscle tone that are within 'normal' range and
22   are not the result of a physiological disorder."  29 C.F.R. § 1630, App.

1  be an impairment when it is both (1) outside the 'normal' range and (2) the result of a

2  physiological disorder." *Morris*, 2014 WL 6612604, at *2 n.7; *Feit*, 281 P.3d at 232

3  (Morris, J., dissenting) ("The guidance plainly provides that a person's weight qualifies

4  as an impairment only if it falls outside the normal range AND occurs as the result of a

5  physiological disorder.  Both requirements must be satisfied before an impairment can be

6  found.").

7        The Taylors also point to a passage in the EEOC's compliance manual indicating

8  that weight that is 100% over the norm constitutes an impairment.  (*See* Resp. at 15 n.109

9  (citing *EEOC Compliance Manual* § 902.2(c)(5)(ii), 2009 WL 4782107 (Nov. 21, 2009)

10  ("Similarly, normal deviations in height, weight, or strength that are not the result of a

11  physiological disorder are not impairments. . . . On the other hand, severe obesity, which

12  has been defined as body weight more than 100% over the norm, is clearly an

13  impairment." (internal citations and footnotes omitted))).)  Even if the court were to

14  adopt that position, however, the Taylors' obesity-discrimination claim would fail

15  because the Taylors have produced no evidence that Mr. Taylor met that standard or that

16  BNSF regarded Mr. Taylor as meeting that standard.

17        Finally, the Taylors suggest that an employer may perceive an obese applicant as

18  disabled if the employer believes that the applicant's weight constitutes an impairment.

19  (*See* Resp. at 15-18 & n.112 (citing *Cook*, 10 F.3d at 20 n.1)); *Lowe*, 2010 WL 5232523,

20  at *7 ("Thus, a plaintiff now might be considered disabled due to obesity under the ADA

21  if the employer *perceived* her weight as an impairment." (emphasis in original)).  The

22  Taylors point out that BNSF was concerned that, given his elevated BMI, Mr. Taylor was

1  at risk of developing conditions such as sleep apnea that might pose a danger to himself

2  and others on the job.  (*See* Resp. at 17-18.)  Thus, they argue, BNSF perceived Mr.

3  Taylor's weight as affecting one or more of his body systems.  (*See id.*)

4        These arguments are based on a misunderstanding of what an employer must

5  perceive in a "perceived as" disability claim:

> A plaintiff cannot state a claim under the "regarded as" prong of the ADA
> . . . simply by alleging that the employer believes some physical condition,
> such as height, weight, or hair color, renders the plaintiff disabled.  Rather,
> the plaintiff must allege that the employer believed, however erroneously,
> that the plaintiff suffered from an "impairment" that, if it truly existed,
> would be covered under the statute[] and that the employer discriminated
> against the plaintiff on that basis.

10  *Francis*, 129 F.3d at 285-86; *see also Andrews*, 104 F.3d at 807.  Further, the EEOC's

11  interpretative guidance explains that the term impairment "does not include characteristic

12  predisposition to illness or disease."  20 C.F.R. § 1630, App.  Therefore, BNSF could not

13  perceive Mr. Taylor as disabled unless BNSF perceived Mr. Taylor as suffering from

14  something that is a "physiological disorder or condition" within the meaning of the

15  statute.  *See Francis*, 129 F.3d at 285-86.  If BNSF instead perceived Mr. Taylor as

16  having something that is merely a characteristic under the statute, it is irrelevant that

17  BNSF believed such characteristic affected Mr. Taylor's bodily systems and made him

18  prone to developing future disorders.  *See* 20 C.F.R. § 1630, App.

19        In sum, the court concludes that under the WLAD, a plaintiff alleging disability

20  discrimination on the basis of obesity must show that his or her obesity is caused by a

21  physiological condition or disorder or that the defendant perceived the plaintiff's obesity

22  as having such a cause.  Washington case law is silent on whether and under what

1    circumstances obesity can be considered an impairment under the WLAD.  The court has

2    therefore looked to the body of law surrounding the ADA, which Washington courts find

3    persuasive in interpreting the WLAD.  Although obesity's status under the ADA is

4    subject to some dispute, the court believes that the Washington Supreme Court would

5    follow the majority approach because (1) that approach is more consistent with the

6    statutory and regulatory language of the ADA, and (2) such language is substantially the

7    same in all relevant respects as the corresponding language in the WLAD.  *See*

8    *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) ("Where the state's

9    highest court has not decided an issue, the task of the federal courts is to predict how the

10   state high court would resolve it.").

11         Under the majority approach, the Taylors' obesity discrimination claim must fail.

12   The Taylors do not allege or present any evidence that Mr. Taylor's elevated BMI is

13   caused by a physiological condition or disorder, or that BNSF perceived Mr. Taylor's

14   BMI as stemming from such a source.  (*See* Resp. at 14-18.)  Instead, the undisputed facts

15   show only that BNSF perceived Mr. Taylor as obese and therefore as being prone to

16   developing certain physiological disorders in the future.  (*See id.* at 18 ("[Dr. Jarrard] is

17   of the opinion that Mr. Taylor may develop one of these [obesity-related] conditions in

18   the future, although he concedes that, at the time of application, Taylor did not have these

19   conditions."); Mot. at 10-11; Reply at 3-5; 1st Jarrard Dep. at 49:2-17, 86:4-25; 2d

20   Jarrard Dep. at 30:7-22, 44:14-45:4, 59:16-60:24.)  Those facts are insufficient to support

21   the Taylors' obesity-based disability discrimination claim.  Consequently, the court

22

1  grants summary judgment in favor of BNSF on this aspect of the Taylors' disability

2  discrimination claim.

3             *b.  Knee and back problems*

4         The Taylors also allege that BNSF perceived Mr. Taylor as disabled due to his

5  knee and back problems.  (*See* Resp. at 14-15.)  In his October 2007 medical

6  questionnaire, Mr. Taylor disclosed bursitis in his knee and back problems.  (Med.

7  Questionnaire at 5; *see also id.* at 3.)  He attributed both of these issues to physical

8  training in the Marine Corps in 2006.  (*See id.* at 5; Clinical Notes.)  During Mr. Taylor's

9  November 2, 2007, conversation with Ms. Henderson, Mr. Taylor stated that he was not

10  experiencing any current problems with his knees and back.  (*See* Clinical Notes.)  In

11  BNSF's November 8, 2007, letter to Mr. Taylor, BNSF informed Mr. Taylor that part of

12  the reason it could not determine his medical qualification was the "uncertain status of

13  knees and back."  (11/8 Letter.)  Furthermore, in its response to Mr. Taylor's EEOC

14  charge, BNSF explained that it rescinded Mr. Taylor's conditional offer in part due to

15  "uncertain status of knees and back."  (Resp. to EEOC at 1.)

16         BNSF argues in its reply brief that the Taylors fail to show a genuine dispute of

17  material fact regarding whether BNSF perceived Mr. Taylor as disabled due to knee and

18  back problems.  (*See* Reply at 7.)  In particular, BNSF contends that the Taylors present

19  no evidence that BNSF perceived Mr. Taylor's "previous back and knee issues to

20  constitute a presently existing disability."  (*Id.*)

21         The parties provide limited briefing on this issue, and as such, the court reserves

22  ruling on the issue for the time being.  The court will hear oral argument on this issue at

1   the pretrial conference, which is currently scheduled for Wednesday, March 2, 2016, at

2   4:15 p.m.  (*See* Dkt.)

3       2.   Veteran's status discrimination

4       The Taylors further claim that BNSF violated the WLAD by refusing to hire Mr.

5   Taylor because Mr. Taylor is a veteran.  (Compl. at 5; Resp. at 23-24; *see also* Taylor

6   MILs at 1-2.)  To support this claim, they note (1) that on the initial application form

7   BNSF improperly asked Mr. Taylor about his discharge status, (2) that following the

8   medical screening BNSF improperly asked Mr. Taylor for his VA disability

9   determination, and (3) that BNSF requested Mr. Taylor's military medical records

10  knowing that it might be difficult for him to obtain them in the time allotted.  (*See* Resp.

11  at 23-24.)  BNSF argues that these requests fail to support an inference that BNSF

12  refused to hire Mr. Taylor because he is a veteran.  (Reply at 10-11 ("The connection to

13  his service is entirely incidental; BNSF wanted Taylor's most recent medical records to

14  examine his fitness for the particular job, and these records happened to be from the

15  military and [VA] . . . .").)  The court agrees with BNSF.

16      Summary judgment is appropriate on this claim because the Taylors have not met

17  the fourth element of their prima facie case.  In other words, they have not produced

18  evidence of circumstances that give rise to an inference that Mr. Taylor's status as a

19  veteran motivated BNSF's decision not to hire him.  *See Riehl*, 94 P.3d at 936; *Hill*, 23

20  P.3d at 446; *Anica*, 84 P.3d at 1236.  BNSF knew that Mr. Taylor was a veteran when it

21  extended a conditional offer of employment to him.  (*See* Application at 2-3; Cond.

22  Offer.)  Its subsequent requests for his military and VA medical records do not plausibly

1  suggest that Mr. Taylor's veteran status motivated BNSF's hiring decision.  Rather the

2  record indicates that BNSF was focused on Mr. Taylor's health and requested his military

3  and VA medical records because those were the most recent sources of information on

4  that topic.[8]  (*See* Resp. to EEOC; Taylor Dep. 38:5-40:3; 11/8 Letter; Referral; 1st Jarrard

5  Dep. at 46:19-47:3, 49:2-17, 86:4-25; 2d Jarrard Dep. at 23:11-25, 29:13-30:22,

6  44:14-45:4, 59:16-60:24.)  The court therefore grants BNSF's motion with respect to this

7  claim.

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15

16  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

    [8] This conclusion holds true even if BNSF's requests were improper under provisions of
the WLAD and its implementing regulations governing pre-employment inquiries.  (*See* Resp. at
23 & n.142 (citing RCW 49.60.180(4) and WAC 162-12-140).)  The Taylors are not suing BNSF

17  for violating those provisions.  (*See, e.g.*, Taylor MILs at 1-2 ("This case involves two (2)
claims. . . . The first claim is that Casey Taylor was perceived to be disabled and was denied

18  employment.  The second claim alleges that Mr. Taylor was not employed because he was a
veteran . . . .").)  They are suing BNSF for discriminatory refusal to hire, (*see id.*); RCW

19  49.60.180(1), and on the facts of this case, BNSF's allegedly improper inquiries do not support
an inference BNSF refused to hire Mr. Taylor based on his veteran status.  Several of the

20  inquires at issue relate to medical information.  (*See* Resp. at 23.)  Such inquiries, if improper,
would be improper as related to disability discrimination, not veteran-status discrimination.  *See*

21  WAC 162-12-140.  Further, the inquiry regarding discharge status occurred before BNSF
extended a conditional offer to Mr. Taylor.  (*See* Application at 3; Cond. Offer.)  Even if BNSF

22  violated RCW 49.60.180(4) by asking that question, nothing indicates that BNSF based its hiring
decision on Mr. Taylor's answer in violation of RCW 49.60.180(1).

1

### IV.   CONCLUSION

2          For the foregoing reasons, the court GRANTS BNSF's motion for summary

3    judgment (Dkt. # 29) in part and RESERVES RULING on it in part.  At the pretrial

4    conference, the court will hear oral argument regarding whether summary judgment is

5    appropriate on the Taylors' claim that BNSF perceived Mr. Taylor as disabled due to

6    knee and back problems.

7          Dated this 17th day of February, 2016.

8

9

10   _____
     JAMES L. ROBART
11   United States District Judge

12

13

14

15

16

17

18

19

20

21

22