1                  UNITED STATES DISTRICT COURT

2                 WESTERN DISTRICT OF WASHINGTON
   ────────────────────────────────────────────────
3
   CASEY TAYLOR and ANGELINA      )
4  TAYLOR, husband and wife and   )
   the marital community          )
5  composed thereof,              )
                                  )
6           Plaintiffs,           )   No. 2:11-cv-01289-JLR
                                  )
7        vs.                      )   Seattle, WA
                                  )
8  BURLINGTON NORTHERN            )
   RAILROAD HOLDINGS, INC., a     )
9  Delaware Corporation           )
   licensed to do business in     )
10 the State of Washington, and   )
   BNSF RAILWAY COMPANY, a        )
11 Delaware Corporation           )
   licensed to do business in     )
12 the State of Washington,       )
                                  )   Pretrial Conference
13          Defendants.           )   March 2, 2016
   ────────────────────────────────────────────────
14 ────────────────────────────────────────────────
15             VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JUDGE JAMES L. ROBART
16              UNITED STATES DISTRICT COURT
   ────────────────────────────────────────────────
17

18 APPEARANCES:

19 FOR THE PLAINTIFFS:   JAY RODERIK STEPHENS
                         The Stephens Law Firm, PS
20                       300 North Meridian
                         Puyallup, WA 98371
21                       rod@stephenslawfirm.com

22

23

24

25

```
 1   FOR THE DEFENDANTS:   BRITENAE M.C. PIERCE
                           Ryan Swanson & Cleveland
 2                         1201 Third Avenue, Suite 3400
                           Seattle, WA 98101-3034
 3                         pierce@ryanlaw.com

 4                         TERUYUKI S. OLSEN
                           Ryan Swanson & Cleveland
 5                         1201 Third Avenue, Suite 3400
                           Seattle, WA 98101-3034
 6                         olsen@ryanlaw.com

 7

 8

 9

10   Andrea Ramirez, CRR, RPR
     Official Court Reporter
11   United States District Court
     Western District of Washington
12   700 Stewart Street, Suite 17205
     Seattle, WA 98101
13   andrea_ramirez@wawd.uscourts.gov

14   Reported by stenotype, transcribed by computer

15

16

17

18

19

20

21

22

23

24

25
```

Taylor v. BNSF, 3/2/16

| | |
|---|---|
| 1 | THE CLERK:  C11-1289, Casey Taylor vs. Burlington |
| 2 | Northern. |
| 3 | Counsel, please make your appearances for the record. |
| 4 | MR. STEPHENS:  Your Honor, my name is Rod Stephens. |
| 5 | I represent the Taylors. |
| 6 | THE COURT:  Mr. Stephens. |
| 7 | MS. PIERCE:  Good afternoon, Your Honor.  Britenae |
| 8 | Pierce here and Tru Olsen for Defendant BNSF Railway Company. |
| 9 | THE COURT:  Thank you. |
| 10 | MR. OLSEN:  Good afternoon. |
| 11 | THE COURT:  Counsel, you're here for your pretrial |
| 12 | conference.  We do these slightly more informally than if we |
| 13 | have an audience.  No offense.  And so just stay seated.  Make |
| 14 | sure the microphone is close to you. |
| 15 | I have a whole list of things to go over with you.  And I |
| 16 | think the easiest way to do that is to discuss the details of |
| 17 | the trial first.  That way, you'll get to hear all the bad news |
| 18 | at one time. |
| 19 | Then, I also would like to discuss the knee and back |
| 20 | problem cause of action.  And for that, if it will make you |
| 21 | more comfortable, you may want to go to the lectern. |
| 22 | Mr. Stephens, you wondered why I asked you to do that.  I |
| 23 | didn't find the briefing to be exhaustive on that.  I |
| 24 | understand the real gravamen of this case has to do with the |
| 25 | body mass question.  And consequently, I felt sort of short |

Taylor v. BNSF, 3/2/16

1   shrift, in terms of either leaving it in or disposing of it,

2   without giving you a little bit more of a chance to explain to

3   me what your thinking was.

4       In addition to that, there's a pending motion by the

5   plaintiff to permit live testimony.  And then finally, I have

6   your motions in limine, which I'm prepared to rule on today.

7   So that's the items that I have that we need to go through.

8       Let me begin with my pretrial outline.  Between now and

9   your trial, I have three cases to try.  All three of them are

10  starting on Monday, the 7th.  They've all had their pretrial

11  conference, they've all had their dispositive motions ruled on,

12  and they all think they're going to trial.  The good news is

13  that several of them are greatly pruned down.

14      So, you are scheduled to begin trial on March 14, 2016.

15  If everything goes before you, you will begin trial on

16  March 21, 2016, at 1:30 p.m.  If any of those cases settle

17  between now and then, I will move you up closer to your

18  original date.

19      Now, I know you hate that, because I used to hate it.  But

20  there are also cases behind you, so we'll worry about that when

21  the time comes, although that one is a criminal case, and they

22  oftentimes settle as we get closer to trial.  After the Court,

23  you will be the first to know, so know that we will keep you as

24  completely up to date as we possibly can.

25      The original estimate of the length of this trial was five

Taylor v. BNSF, 3/2/16

```
1   days, and that was to include all of the body mass cause of
2   action.  And since we've now pruned this down significantly, I
3   have my estimate of how long I think it should take, but it
4   seems a wise idea to ask you how long you think it should take.
5        So, Mr. Stephens?
6             MR. STEPHENS:  Your Honor --
7             THE COURT:  You can just stay seated, sir.  It's
8   okay.
9             MR. STEPHENS:  Okay.  Thank you.
10       I hesitate promising something I can't deliver, but I can
11  see this case being tried in three to four days.
12            THE COURT:  All right.
13            MS. PIERCE:  Your Honor, we don't believe it should
14  last any longer than three days.
15            THE COURT:  Well, I have you down for four, so we're
16  all in the same general area.
17       I do trials on the clock -- I find that to be extremely
18  useful in terms of making you pay attention to what's going
19  on -- so I'm going to give each of you nine hours to try your
20  case.  You should know that that means jury selection,
21  openings, direct and cross examinations, and closings all are
22  going to occur within your nine hours.  I serve as the
23  timekeeper, and there is no appeal from the chair.  Every start
24  of every day I'll tell you where you are, so it's not going to
25  be any surprise.
```

Taylor v. BNSF, 3/2/16

```
1        It is my intention to impanel an eight-person jury.
2   You're in federal court.  I don't know how much time you've
3   spent in state court.  Remember, in federal court there are no
4   alternates in civil cases, so everybody in the box is going to
5   end up being an actual juror.  We don't have alternates.
6        Hours, except on that first day when you're beginning at
7   1:30, are 9:00 a.m. to noon, with a 15-minute break at 10:30,
8   and from 1:30 to 3:00, 15-minute break, and then 3:15 to 4:30.
9   One of my peculiarities is I take a hard stop at 4:30.  I won't
10  cut you off mid-sentence, but it will be similar to that.
11  We've been finding that most of our jurors end up taking the
12  bus.  Some of them don't normally take the bus, but they take
13  the bus because they're coming downtown.  And in that
14  circumstance, they get an idea of where it is that they're
15  going, who it is that they're going to ride with and whatever,
16  and so we try very hard to allow them to do that.
17       In terms of jury impanelment, I will ask the questions
18  that are in the federal court benchbook, which in civil cases
19  are pretty easy.  I will ask the questions out of your proposed
20  voir dire that I think are appropriate.  I don't tend to invade
21  the province of the jury very much.  I don't ask them what
22  church they attend, what was their favorite movie, what did
23  they think of Chris Rock at the Oscars, all that sort of stuff.
24  But things pertaining to, have you ever operated a train, or
25  did you ever work for a railroad, that's more appropriate.
```

Taylor v. BNSF, 3/2/16

1        At the conclusion of that, I pride myself on the fact that
2   I leave time for lawyer-conducted voir dire.  It oftentimes is
3   not very much.  It can be 15 to 20 minutes.  Interestingly, I
4   find most times lawyers don't use all of it, which I take as a
5   matter of we've covered enough that you're going to be able to
6   pick a jury.
7        At the conclusion of all of that, we do for-cause
8   challenges.  The slip of paper will start.  Mr. Stephens,
9   you'll do one name and then go to the defense, who will do one
10  name, back to Mr. Stephens until you -- back and forth until
11  you eliminate all for-cause challenges -- excuse me.  I'm on
12  the wrong track here.  At the conclusion of voir dire, I will
13  meet with you for for-cause challenges.  We do that in the back
14  room, and I rule on those.  So at the point you're doing the
15  peremptory challenges, you'll know who's in or out of the jury.
16  We have a handout on all of this, and so it's pretty
17  straightforward.
18       The question I sometimes get is, if we have one of our
19  peremptory challenges taken off, Juror -- Voir Dire Panel
20  Juror 7, can we go back and do a number before them?  The
21  answer is, absolutely.  I'm told that some states have a rule
22  you can't go back.  That's not enforced around here.
23       For opening statements, I will read the preliminary jury
24  instructions.  They are just be assist he form jury
25  instructions out of the model instructions, with the exception

Taylor v. BNSF, 3/2/16

 1  of Number 2, which I would like you to get together and agree

 2  on.  I don't do a:  There's a cause of action for this, this is

 3  the elements of the cause of action; rather, I'm simply trying

 4  to set some factual background for them to hear testimony.  So

 5  if you do it, that's great.  If you don't do it, I will.  And

 6  yours will undoubtedly be better, so please try and cooperate

 7  on that.

 8       In terms of how long you want to spend on your opening

 9  statement, up to you.  It's one of the two times that you get

10  to leave the lectern.  I have a rule that from the clock on

11  that back wall to me, my left-hand side, which is away from the

12  jury, is -- you can come right up to this line.  Please don't

13  cross the line.  No leaning on the jury box.  It is always

14  interesting to me -- periodically, some lawyer will start to

15  wander over there, and I love to watch the jury rock back in

16  those chairs.  So just stop on this line.  Anything you want to

17  do up here, that's fine.  You can pace.  Most people end up

18  trying to put their notes somewhere up by the podium, the

19  lectern, but please don't approach the jury.

20       We have a handout on exhibits.  It's really complex.

21  Mr. Stephens' exhibits are going to be 1, 2, 3, and 4.

22  Defendants' Exhibits will be A1, A2, A3, A4.

23       I don't do bulk admissions of exhibits.  You have to have

24  a witness or some reason to propose the admission of the

25  exhibit.  At that point, if I admit it, it can be shown to the

Taylor v. BNSF, 3/2/16

1   jury.  It will not be shown to the jury before that.

2        People have asked me why I do that.  The reason is that I

3   get to talk to the jurors afterwards.  You don't.  And on

4   occasions when we've admitted, for example, a contract, it's 50

5   pages long, and the whole fight is about one paragraph, they'll

6   read the other 49 pages, and the conclusions that they draw are

7   far-reaching and rarely connected with reality.  So, you know,

8   we only send back into the jury room those exhibits which have

9   been admitted.  And hopefully, you've highlighted in your

10  presentations what it is they should be looking at.

11       We have technology training that's available.

12       I understand you're going to cheat and bring someone in?

13            MS. PIERCE:  Yes.

14            THE COURT:  If you haven't used this stuff recently,

15  come by for the monthly training, or make arrangements to do

16  so.  The second most discussed subject, when I talk to the

17  jury -- the first one is:  Did we get it right?  And I say:

18  You decided it.  Congratulations.  That's all I'm going to say.

19  The second is:  How come the lawyers don't know how to use the

20  technology?  So it's gotten so bad that sometimes they actually

21  have a pool over how many exhibits will be upside down when you

22  push the button and admit them and they're able to see them.

23       You have some depositions, and we're going to talk about

24  that motion before we leave here today.  Please read the local

25  rule which has got an extended discussion of color-coding and

Taylor v. BNSF, 3/2/16

| | |
|---|---|
| 1 | objections and trading them back and forth.  When Mr. Baris and |
| 2 | I go back into chambers, we're going to see if we're dismissing |
| 3 | a case for their failure to follow that, which did not prompt |
| 4 | much favor with the Court.  It makes sense.  And also, if |
| 5 | you're going to edit your videotapes, it's -- let's get it |
| 6 | done, and we'll get it back to you so you'll have time to do |
| 7 | that. |
| 8 |     Another peculiarity of mine is that if the jury is here, |
| 9 | we try and use their time wisely.  I discourage sidebars.  I |
| 10 | know sometimes they're necessary, but I attempt to discourage |
| 11 | them.  And I very, very much discourage sending the jury back |
| 12 | into the jury room.  It drives them crazy.  They're giving up |
| 13 | their lives for, you know, four or five days.  The least we |
| 14 | could do is use their time wisely. |
| 15 |     My view of that is that if you want me to come out early, |
| 16 | if you want me to stay over lunch, if you want me to stay |
| 17 | afterwards, I'm happy to do that.  Let me know if you have a |
| 18 | problem that's coming up, witness unavailability, fighting |
| 19 | about an exhibit, you need to call someone for foundation, so |
| 20 | that I can determine if the exhibit is coming in or not. |
| 21 | That's all stuff that we really can't do without sending the |
| 22 | jury somewhere so that they won't hear it.  And I just really |
| 23 | try hard to not create that situation. |
| 24 |     Last two items, jury instructions, you will have submitted |
| 25 | jury instructions, and there's a local rule on that also. |

Taylor v. BNSF, 3/2/16

```
1   There's an agreed set of instructions.  There's citations to
2   instructions.  There are your comments on what's wrong with the
3   other side's proposed instructions.  The -- it works pretty
4   well.
5       We will get a proposed set of instructions as quickly as
6   we can.  We'll distribute them to you, give you a little bit of
7   time -- like your lunch hour, usually -- to give us comments on
8   the instructions.  It's informal.  It's off the record.  It
9   doesn't count for anything.  No one knows what happens, other
10  than those of us who are here.  The idea is you're going to
11  tell us what we got right and what we got wrong and what we
12  didn't include that you think is necessary.  We will then come
13  up with a final set of instructions, give you an equally long
14  period of time to review those, and then ask you to take your
15  formal instructions -- exceptions.
16      Remember, you're in the Ninth Circuit, which has some
17  unusual case law on exceptions to instructions.  You can't
18  simply say:  I except to Instruction Number 2.  They don't
19  think that's sufficient.  You've got to tell me what's wrong
20  with it.  So know that that's the law out there.
21      Let me at this point take a break.  Mr. Stephens, any
22  questions?
23          MR. STEPHENS:  Your Honor, sometimes during the
24  course of the case you see that you may need an instruction
25  that, you know, conforms to the evidence that comes out at
```

Taylor v. BNSF, 3/2/16

1   trial.

2        How do you take those?

3        THE COURT:  You propose them to me as soon as you can

4   so that we have a chance to take a look at them.

5        MR. STEPHENS:  Thank you.

6        THE COURT:  I discourage them.  I've never prohibited

7   people from doing it, because the need arises.  There's one

8   lawyer in Seattle who's notorious for having never submitted a

9   jury instruction until during trial.  We talk about him at

10  lunch.

11       You know, most of the time you're going to see this stuff

12  coming.  Every once in a while, you won't, and that's an issue.

13       So I'm not sure that in terms -- well, Counsel, anything?

14       MS. PIERCE:  A couple quick things, Your Honor.

15       May we use demonstratives in opening as long as the

16  parties have exchanged them in advance?

17       THE COURT:  You can.  But you've got to have shown

18  them to the other side, and they agree.  If you don't agree,

19  tell me.  I'll come out and rule.

20       MS. PIERCE:  Also, we had a couple issues

21  specifically about our pretrial order.

22       Would you like us to address those now?

23       THE COURT:  What were they, because I don't remember

24  reading them?

25       MS. PIERCE:  We just inadvertently -- I think both

Taylor v. BNSF, 3/2/16

```
1    parties missed an exhibit.  We just want to make sure it was
2    listed on the pretrial order.  And we also wanted to follow up
3    that both parties are agreed that one of the defendant names
4    should not be involved in this case, and the defendant should
5    just be BNSF Railway Companies.  We wanted both of those
6    addressed.
7              THE COURT:  Do you have any objection to either of
8    them?
9              MR. STEPHENS:  No.  That's accurate, Your Honor.
10             THE COURT:  Well, then either submit a revised
11   pretrial order, or just submit it as supplement to us saying
12   these are the changes that are going to be made.
13             MS. PIERCE:  Thank you, Your Honor.
14             THE COURT:  Anything further?
15             MS. PIERCE:  We'll just be prepared to discuss
16   witness scheduling and the motion to permit live testimony as
17   the Court requests.
18             THE COURT:  Well, witness scheduling is easy.
19      You will hear me laud praise on you for cooperation in
20   terms of scheduling witnesses.  The jury gets it.  They don't
21   get confused by this.  And what they take away from it is the
22   notion:  Hey, these guys are trying to use my time wisely.  You
23   know, what a concept.  And consequently, you know, they like
24   you better.  And if they like you better, they pay attention,
25   which is my goal here, is to have them pay attention.
```

Taylor v. BNSF, 3/2/16

```
1        So cooperate on it.  It's a two-way street.  I was going
2    to say the railroad runs both directions, but that's probably
3    inappropriate.  I explain that we're taking someone out of
4    order, that, you know, normally this would be in a different
5    part of the case, but for scheduling reasons -- and they just
6    get that, so feel free to do it.
7        In terms of disclosure of witnesses, my rule is that
8    4:30 of the day before you've got to tell the other side who
9    your witnesses are.  You're not locked into it, but you better
10   have a darned good reason if you're not going to do it.  I've
11   never yet had a heart surgeon testify when he was supposed to
12   testify, because people are always having heart attacks, and
13   they have to run off somewhere.  Most of the rest of the time,
14   particularly if you've got people coming from out of town, you
15   know, you know they're going to be here, and we'll get them on
16   and off.
17       Does that answer your question?
18            MS. PIERCE:  Yes.  Thank you, Your Honor.
19            THE COURT:  Okay.  Mr. Stephens, I'm not sure what
20   I've got left on the live video testimony.  You have withdrawn
21   Mark Roehlling; is that correct?
22            MR. STEPHENS:  Yes, Your Honor.  In light of your
23   ruling on the obesity issue, Dr. Roehlling's testimony is not
24   necessary.
25            THE COURT:  Okay.  Then the second witness is -- I
```

Taylor v. BNSF, 3/2/16

```
1    guess he's an M.D., so it's Dr. Jarrard?  I'm undoubtedly
2    butchering that one.
3              MR. STEPHENS:  I think we have that resolved.  I
4    haven't had a chance to talk to counsel, but Mr. Olsen sent me
5    a letter today, that he's going to be testifying live -- and
6    please correct me if I get this wrong -- that I can cross
7    examine him and do my normal examination during -- after your
8    direct; is that correct?
9              MS. PIERCE:  That's correct.
10             MR. OLSEN:  Yes.
11             MR. STEPHENS:  I guess the only concern I would have
12   is that they don't move for a directed verdict before I get a
13   chance to cross examine him.
14             THE COURT:  That's one of the problems with my
15   approach to this, because I only have witnesses testify once.
16   Juries really are confused -- if, you know, the witness has
17   just been examined, all his testimony has come out, the other
18   side is going to cross examine him, but they're calling him as
19   part of their case in chief -- you know, my rule is, we get
20   them up there, let's get them done.  So you get some leeway.
21   It's basically the old Rule 56 language, that, you know, Judge,
22   don't rule on this motion for directed verdict until I have a
23   chance to put on my testimony with this witness.  I will tell
24   you, I rarely grant directed verdicts during a trial, just
25   because I want to hear what -- everything that has to be said
```

Taylor v. BNSF, 3/2/16

```
 1    before we do that; so that has tended not to be a big issue.
 2         The other two witnesses that are identified are Dane
 3    Freshour, who seems to be a "will testify," and then Joy
 4    George, who it's not -- this is not identified in what I've
 5    seen -- that is either a "may testify" or a "will testify."
 6         Is that a "will"?
 7              MS. PIERCE:  Your Honor, we do not intend to call
 8    either Mr. Freshour or Ms. George during our case or otherwise,
 9    although we understand that plaintiffs' counsel is seeking to
10    either use their deposition testimony or to call them live.
11              THE COURT:  I think the part that's before me is
12    calling them live, and I'm going to deny that motion.  I grew
13    up believing that the federal rules were meant to be the
14    federal rules.  I understand the purpose of live testimony.
15    However, it's not what's provided for in the rules.  And I
16    really do think, particularly in this instance, were you
17    probably have video testimony from the deposition, there was
18    the opportunity then to have both sides prepare the witness and
19    ask the questions that they want to ask.  So I'm going to deny
20    54, plaintiff's motion to permit live video testimony.
21         Let's turn to the knee and back problems.  I anticipate,
22    Mr. Stephens, that you're going to want to take my ruling on
23    body mass up and have people who know more than me decide it.
24    And so, in a way, I think this is sort of a tag-along.  You
25    know, frankly, I'm curious to see what they say.  I mean, there
```

Taylor v. BNSF, 3/2/16

1    are -- there's one dominant line of authority.  There is some

2    interesting outlying authority.  And they don't have much

3    problem disagreeing with my rulings, so we'll find out what

4    they're going to do.

5        In a way, it seems unnecessary to have this trial, because

6    the amount of time you all spent on knee and back problems was

7    fairly miniscule.  And that was reflected, as I said -- and I

8    don't mean this as any criticism of you in your briefing.  I

9    mean, I can find about a page and a half on this issue.

10       Mr. Stephens, as I understand it, there are three theories

11   that you can pursue on this.  One is actual disability, a

12   second is perceived disability, and the third is record of a

13   disability.

14       Our understanding of your pleadings is that you are

15   proceeding on a perceived disability theory; is that right?

16           MR. STEPHENS:  That's correct, Your Honor.

17           THE COURT:  Okay.  So I can get away from legal

18   analysis in actual disability and record of disability.

19           MR. STEPHENS:  Yes.

20           THE COURT:  Okay.  Tell me, then, what is your best

21   evidence on perceived disability?  Let me make this even easier

22   for you.  I can find, as I've tried to write this out, you've

23   got -- the factual background, the November 2 conversation,

24   Mr. Taylor says he's not experiencing any current problems.

25   And that's backed up by the clinical notes.  Then in the

Taylor v. BNSF, 3/2/16

1   November letter from Burlington Northern, he's told that part

2   of the reason they could not determine his medical

3   qualification was "unsure status of knees and back."  And then

4   in the EEOC letter, Burlington Northern says it's rescinded the

5   offer in part due to "uncertain status of knee and back."

6       That's everything that I could find out of the record.  So

7   what else is there?

8           MR. STEPHENS:  Well, we believe it's significant that

9   Mr. Taylor passed all the BNSF medical examinations.

10      Do you want me to stand, Your Honor?

11          THE COURT:  I want you to do whatever you're the most

12  comfortable.  If you want to gesture, feel free to stand up and

13  go to the lectern.

14          MR. STEPHENS:  I don't want to gesture at the judge.

15          THE COURT:  People do all the time.

16          MR. STEPHENS:  We feel it's significant that

17  Mr. Taylor passed all of BNSF's medical examinations and that

18  they can't point to one medical condition that says that there

19  was an obstacle to his ability to perform essential functions

20  of the position.  All we have is speculation about what may

21  happen in the future.  And those unsupported speculations

22  relate to the problem he had in the Marines, with physical

23  training related to his knees and back, that were resolved

24  while in the military, that weren't part of his discharge.  And

25  BNSF's tests revealed that there weren't any problems with the

Taylor v. BNSF, 3/2/16

```
 1   knees and back.  Before he was even examined, BNSF had asked
 2   for all of his entire records, and Mr. Taylor tried to provide
 3   those records.  He learned from the Veterans Administration
 4   that they were in North Carolina, and he didn't know when he
 5   could get them or how he could get them.
 6        And after the medical examination, after he passed it, his
 7   file was referred to BNSF medical.  And that's when Dr. Jarrard
 8   said that even though the referral made no mention of the knees
 9   and back, the way it was written was a prompt to see why BNSF's
10   medical examiners wanted him -- or had requested medical
11   records.  Jarrard knew he'd been recently discharged from the
12   military.  Jarrard knew that it would be difficult to get
13   medical records.  He also knew that the examination revealed
14   that the knee and back were asymptomatic.  He also knew that
15   the examination revealed that Taylor could perform the
16   essential functions of the electronic technician position.
17        Essentially, he went into the medical evaluation, and
18   Dr. Jarrard knew that there was not a problem with the knees
19   and back, other than what was in his history.  Dr. Jarrard
20   admitted that he could perform a variety of tests, and he could
21   have ordered an examination by a doctor selected by BNSF --
22             THE COURT:  You're going to have to slow down, or
23   else you're not going to get a record.
24             MR. STEPHENS:  Oh, I'm sorry.
25             THE COURT:  Go ahead.  Just remember to breathe every
```

Taylor v. BNSF, 3/2/16

```
1    once in a while.
2              MR. STEPHENS:  I didn't realize I was talking that
3    fast, Your Honor.  I apologize.
4              THE COURT:  Whenever people start looking at their
5    notes a lot, they tend to speed up.  And when you read, boy,
6    everybody reads at lickety-split speed.
7              MR. STEPHENS:  Well, they could have had -- they
8    could have had a doctor examine Casey Taylor.  Employers
9    routinely examine, or have a medical examination performed,
10   when there's an additional question.  Dr. Jarrard's excuse
11   was -- is that the -- if we look at his condition in the
12   medical examination today -- and I'm paraphrasing, Your
13   Honor -- it tells us what his condition today is like, but it
14   doesn't tell us what the condition was like in the past.
15        The problem with that argument is that the issue is, can
16   he perform the essential functions of the job?  And if your
17   medical examination reveals there's a problem, then we get to
18   another issue, which is an accommodation dialogue, which we
19   never got to in this case.  The reality is, Casey could do the
20   essential functions of the job.  And unless BNSF had more, they
21   shouldn't have thrown additional obstacles his way.  And it's
22   clear that BNSF perceived the knees and back as being a
23   problem, because they then said:  Here's a series of things
24   that you have to do, and you have to accomplish these things
25   between November 7, when the e-mail was sent from Dr. Jarrard,
```

Taylor v. BNSF, 3/2/16

1   and November 26, which is the 30 days from his conditional

2   offer.  So he's got less than three weeks to accomplish all

3   these things.  And all these things that he had to accomplish,

4   he was going to have to pay for.

5       And they threw what I would call the poison pill into the

6   mix, which was:  And on top of that, now we don't want your

7   medical records.  What we want is your Veterans Administration

8   disability determination.  But it hadn't even been prepared

9   yet.  It was still in the process of being prepared and

10  wouldn't be finalized until the 26th of November.  And

11  Mr. Taylor's testimony was that he would receive it about a

12  week later.

13      When Casey Taylor saw the letter that said, we want you to

14  do all these things, he immediately contacted BNSF.  And as the

15  record shows, he wrote; he called Joy George on two occasions

16  to see what he could do about getting this job, and he was told

17  that he couldn't get the job.  He asked to have testing paid

18  for.  BNSF wouldn't pay for the testing.  And as the Court is

19  aware, in the case that Judge Pechman recently ruled on, she

20  held that employer-required testing should be paid for by the

21  employer.

22          THE COURT:  You're going to hear about that one in

23  the motions in limine, so I think I'm aware of that.

24          MR. STEPHENS:  Okay.  So what BNSF is saying is that

25  Casey Taylor didn't cooperate.  And that's nothing short of a

1    fiction.  Casey was willing to do whatever he could do to get

2    his job.  The problem was, is that he couldn't afford to pay

3    for the testing.  And we believe that a jury could arrive at

4    the conclusion that it was because of Casey Taylor's honest

5    answers to his medical questionnaire, that were obtained

6    post-offer, that -- if he hadn't given those honest answers,

7    BNSF wouldn't have requested additional testing.  And now BNSF

8    is trying to say:  Well, you in essence declined the offer,

9    because you didn't get the testing that you couldn't afford.

10       Now, if an employer requires testing that's merited,

11   that's the law.  They're allowed to have that.  But the law

12   isn't that the employer gets to have the employee or their

13   insurance company subsidize employer-required medical testing.

14       THE COURT:  So here's the problem I have with that

15   answer.  You ruled out for me that it's an actual disability.

16   They didn't say:  You're disabled.

17       MR. STEPHENS:  That's correct.

18       THE COURT:  And you ruled out it's -- you have a

19   record of this disability.  So I'm in that sphere of perceived

20   disability.  And, you know, I'm very fond of written --

21   contemporaneous written records, because they're not subject to

22   post-event hindsight.

23       And what I hear here is the -- I want to make sure I quote

24   this -- "the uncertain status of knee and back."  That's the --

25   I guess I'm not sure who wrote it, but it's in the conversation

Taylor v. BNSF, 3/2/16

```
1    with Henderson, and it gets translated as that in the
2    November 8 letter, "uncertain status."  And then later on in
3    the EEOC, which, you know, you think is a real smoking gun,
4    they say they rescinded the offer in part due to uncertain
5    status of knees and back.
6         Is it enough, under the perceived disability test, if
7    someone says, "We might have a problem"?
8              MR. STEPHENS:  It is not enough, under the perceived
9    disability test, as the Garrison case that was in
10   Judge Pechman's ruling illustrates, is an employer can't
11   speculate about what may happen in the future.  And here, they
12   had nothing concrete.  It's the employer's burden to prove that
13   he can't perform the essential functions of the job.  If the
14   Court's looking for authority on that, that would be EEOC vs.
15   Wal-Mart, which is an Eighth Circuit case.
16             THE COURT:  That was going to be my next question is,
17   give me absolutely your best authority on that.
18             MR. STEPHENS:  EEOC vs. Wal-Mart, 477 F.3d 561, 568.
19             THE COURT:  And now, he's even slower than the court
20   reporter, so would you repeat that cite?
21             MR. STEPHENS:  Sure.  EEOC vs. Wal-Mart, 477 F.3d 561
22   and 568.  And the cite to the Garrison case is --
23             THE COURT:  I think Garrison is in your briefing.
24             MR. STEPHENS:  I don't believe -- it's in
25   Judge Pechman's ruling, is 287 F.3d 955.
```

Taylor v. BNSF, 3/2/16

```
 1              THE COURT:  Now, you know that Judge Pechman went
 2    senior and is no longer my floor mate here.
 3              MR. STEPHENS:  I didn't know that, Your Honor.
 4              THE COURT:  All right.  Thank you, sir.
 5         Anything else you'd like to say on this subject?
 6              MR. STEPHENS:  Well, I think the other thing is just
 7    that we have an issue of fact between the two statements made
 8    by BNSF in their EEOC position statements and the diametrically
 9    opposed positions they took and whether that was shifting
10    pretext.
11              THE COURT:  All right.  Ms. Pierce?
12              MS. PIERCE:  Mr. Olsen will be handling this one,
13    Your Honor.
14              THE COURT:  Mr. Olsen.
15              MR. OLSEN:  Yes, Your Honor.
16         I guess first, this case has always been about BMI, taking
17    on your comments.  The knee and back is almost an afterthought.
18    One of the things that we'd like to call your court's attention
19    to would be in the briefing, Ms. Pierce's Exhibit N,
20    plaintiffs' response to Interrogatory Number 14, dated
21    September 15, 2015, where BNSF served the interrogatory
22    requesting:  Identify the disabilities or impairments you
23    assert BNSF regarded you as having during the hiring process in
24    2007.  The only response was related to disabilities and
25    impairments associated with obesity.  The knee and back issue
```

Taylor v. BNSF, 3/2/16

 1    through discovery was not brought up as an issue that was going

 2    to be litigated at trial on whether it was perceived or not.

 3    That issue came up in response to summary judgment.

 4         And the reason is, it's because it was not material to

 5    this case.  The knee and back issue was related to lawful

 6    requests for medical information in response to voluntarily

 7    disclosed information that could affect Mr. Taylor's

 8    qualifications and safety.  The job posting that is at issue in

 9    this case lists that there's a requirement for a 40-pound

10    overhead lifting, as well as a lifting and carrying requirement

11    of 50 pounds.

12         And Mr. Taylor, after he received his conditional offer,

13    disclosed knee and back pain.  Well, there was also a

14    disclosure of historic diagnosis of bursitis.  But BNSF didn't

15    have any reason to believe that either of those were accurate,

16    or the veracity, and so it was uncertain whether or not those

17    were even things that could be considered.  However, because of

18    the job, and because of the safety-sensitive requirements, the

19    fact is, BNSF was uncertain whether or not these would play any

20    role whatsoever.  And so they requested them, requested medical

21    records.  In fact, in the conversations and e-mails with

22    Ms. Henderson prior to any employment action taking place, BNSF

23    requested those records.  They were never provided.  The fact

24    that BNSF's letter of November 8 stated it was uncertain about

25    the status of knees and back is not in itself evidence that

1    there was any perceived disability.

2          Additionally, that letter that was sent lists a few

3    different things that BNSF requested as far as medical

4    examinations.  As far as the knee and back issue, the only

5    aspect of that letter concerned:  Provide us medical records,

6    specifically the Veterans Administration disability

7    determination.  And that was done, because BNSF didn't have any

8    records, didn't have any way to determine whether or not there

9    was any condition, or whether or not any condition could in

10   itself be a problem for Mr. Taylor's safety.

11         We want to be clear that the request for medical

12   information itself is not evidence of pretext or perceived

13   disability.  We would cite for the Court *Norman-Bloodsaw vs.*

14   *Lawrence Berkeley Lab*, 135 F.3d 1260, at Page 1273, Ninth

15   Circuit case from 1998, that discusses under the ADA standard

16   the conditional offer of employment stage and what is

17   acceptable as far as medical inquiries.  And in fact, it says:

18   The ADA imposes no restriction on the scope of these entrance

19   examinations.  It only guarantees confidentiality of them.

20         The federal regulations, at 29 CFR 1630.14(b)(3), state

21   that medical examinations conducted in this conditional offer

22   stage do not have to be job related or consistent with business

23   necessity.  So Washington law does not have specific

24   regulations about post-offer examinations.  In fact, its

25   regulations only have discussion about preexamination

Taylor v. BNSF, 3/2/16

1   inquiries.  And we believe that those simply do not apply in

2   this case, because BNSF did offer him a job.

3       Additionally, addressing Mr. Stephens' discussion about

4   BNSF testing had cleared him for the essential functions, BNSF

5   had independent third parties do standard examinations of

6   Mr. Taylor.  And those tests wore an IPCS test, which tests

7   just the strength of his knee and the strength of his shoulder;

8   didn't have anything to do with any back issues.

9       The other examinations were conducted by Ms. Henderson.

10  And while the examinations itself showed that any symptoms were

11  asymptomatic, that's all the information that BNSF had, which

12  is there were no issues with knee and back, and so -- as far as

13  knee strength.  And so when he discloses that he did have knee

14  and back issues, a request for information, simply saying,

15  "Show us what those are," does not provide evidence that BNSF

16  actually perceived that there were any issues.

17      Now, had BNSF received those records, we don't know what

18  would have happened.  Dr. Jarrard could have just cleared him,

19  saying:  I've seen these records.  They don't have any problem.

20  He could have said:  We need to submit you to further medical

21  inquiry or examination.

22      Now, the whole issue that we have here on summary judgment

23  is whether or not it's necessary to have a jury make

24  determinations of fact.  And the determinations of fact in this

25  case are going to be about, did Mr. Jarrard have a legitimate

Taylor v. BNSF, 3/2/16

```
 1   basis to request additional information about Mr. Taylor's
 2   knees and back?  And even if plaintiffs can show that they can
 3   meet a prima facie case, and Mr. Taylor was actually qualified
 4   because he was medically fit to perform the job -- which the
 5   only evidence of that in the record is these BNSF
 6   examinations -- and he can show that the circumstances give
 7   rise to an inference that there was actually discrimination,
 8   which we don't believe that the record reflects any such
 9   information, on summary judgment there's still an issue of
10   they've got to show evidence of pretext.  They've got to show
11   it, that the stated reason why Mr. Jarrard -- or Dr. Jarrard
12   requested those records is untrue, that it was not based in
13   fact.  And there is uncontroverted evidence in the record that
14   the reason why Dr. Jarrard requested that information is
15   because he didn't know if there was any issues with
16   Mr. Taylor's knees or back that could cause him to be unsafe or
17   not qualified to be able to perform his job.
18       So what we really want to come back to is, the record
19   itself does not have the requisite evidence.  Plaintiffs have
20   not met their burden of production to either meet a prima facie
21   case, or, because there's a legitimate purpose for requesting
22   records, that there was any pretext behind that request itself.
23   We understand Mr. Stephens has argued -- there's an issue about
24   whether or not the job offer was rescinded or if it was simply
25   left open.  That is not a material issue of fact here in light
```

Taylor v. BNSF, 3/2/16

1  of the record that doesn't disclose any basis for pretext.

2       And if Your Honor has any further questions or

3  clarifications that are needed, I'm happy to address those as

4  well.

5            THE COURT:  Well, I'm going to ask you the same

6  question, which is, what is your best evidence on this question

7  of the term "perceived disability," that supports your position

8  in this motion?

9            MR. OLSEN:  I think I'm struggling with exactly the

10  question, Your Honor.

11       Are you asking what is the best authority to say that --

12            THE COURT:  That supports your position.  I mean, the

13  issue to me comes down to what we're going to ask you next,

14  which is, you might have a problem -- if that's the state of

15  the record, you might have a problem.

16       Is that sufficient to support a perceived disability cause

17  of action?

18            MR. OLSEN:  No, Your Honor.  We would want to direct

19  the Court to really a few cases.  But I would say the best one

20  that we would like to bring up would be the *Hume vs. American*

21  *Disposal* case.  That is at 124 Wn.2d 656, at Pages 671 to 672,

22  a 1994 case.  And that's where there can be no -- there can be

23  no disability discrimination if the employer lacks notice that

24  the employee suffers from a serious medical condition.

25       And in the *Hume* case, there was an issue with an employee

Taylor v. BNSF, 3/2/16

1  who brought to his employer's attention that he had discomfort,
2  and he had pain in his hands.  And the employer then, you know,
3  requested information, medical information.  That information
4  was provided and disclosed; no actual condition.  The Court
5  found on summary judgment that the employer was not on notice
6  of that.  You know, there's no disability or perceived
7  disability simply because somebody notifies the Court -- or
8  notifies the employer of pain.

9      That's almost exactly what we have in this case except
10  it's not ongoing pain.  It's past pain.  Mr. Taylor said:  I
11  had pain in the past.  BNSF asked for records, and it never was
12  put on notice that these things could be a condition that could
13  be a disability.

14      The other case that we would call to the Court's attention
15  is *Rhodes vs. URM Stores*, 95 Wn.App. 794, 801, a 1999 case.
16  And we believe that while not the actual statement of law, that
17  we believe that that implies that even when an employer has
18  notice of a possible condition, lack of knowledge about a
19  condition needing accommodation and lack of evidence that it
20  was the reason for the adverse employment action still entitles
21  the employer to summary judgment.

22      And we would also request that the Court just look at the
23  factors for the burden of production required to establish
24  pretext, as well.

25          THE COURT:  All right.  Thank you.  That was helpful.

Taylor v. BNSF, 3/2/16

 1   It's more extensive than what your briefing was earlier.  I

 2   appreciate that.

 3        Ladies and gentlemen, your pens to the ready, I'm about

 4   to --

 5             MR. STEPHENS:  Your Honor, before we leave the

 6   argument, I just -- I wanted to raise something to your

 7   attention.  I don't know how you're going to rule on the

 8   summary judgment motion, obviously, but trial is approaching

 9   quickly.  And the -- it appears to me that really the back and

10   knee issue and the obesity issue are based on the same

11   operative or nucleus of facts.  They're inextricably

12   intertwined.  And this seems to be a case that would be,

13   because of the differing opinions of the federal district

14   courts, the absence of law in Washington -- law in Washington,

15   sorry about that -- the direction that some of the state courts

16   have taken, to be an issue that would be ripe for permissive

17   interlocutory appeal to the Ninth Circuit; because either we go

18   to trial on the back and knee issue, we're still going to

19   appeal and do the obesity issue.  But if we go to trial on the

20   back and knee issue, we're going to be locked into a position

21   that unfortunately may prejudice our position on appeal.  And

22   that would be grossly unfair to Mr. Taylor and to Mrs. Taylor.

23        And the federal rules of appellate procedure allow you to

24   amend the summary judgment order to permit interlocutory

25   appeal, and the plaintiff would request that you permit

Taylor v. BNSF, 3/2/16

```
 1   interlocutory appeal, or at least allow us to submit a request

 2   for permissive interlocutory appeal to the Ninth Circuit.

 3         THE COURT:  You know, I don't want to keep butchering

 4   your name.  Is it "Stephens" or "Stephens"?

 5         MR. STEPHENS:  It depends on which side of the family

 6   you talk to.  Those of us that graduated from high school, it's

 7   "Stephens."  The other, it's "Stephens."

 8         THE COURT:  Okay.  Mr. Stephens, I want to make sure

 9   I understand what you're asking.  At one point, I could quote

10   all of these numbers.  I think you're asking for a 14 -- it

11   isn't 1492 -- interlocutory appeal.  Since you have your

12   computer out, you could -- you would like that on the body mass

13   question?

14         MR. STEPHENS:  I would, yes.

15         THE COURT:  And if I'm not inclined to do that, which

16   I have to tell you, cases do not get better the older they get.

17   I would rather send you up there with a full appeal than send

18   you up there with one appeal and have a tag-along remain in

19   this court.

20         MR. STEPHENS:  I would -- I would -- well, if you

21   were going to send us up on an appeal, then obviously we would

22   ask for a stay of the trial date, because I don't want to do

23   two things at once.

24         THE COURT:  Well, your appeal in the Ninth Circuit,

25   sir, is probably going to be 18 to 24 months.
```

Taylor v. BNSF, 3/2/16

```
 1          MR. STEPHENS:  I understand that.  And I would rather
 2    to -- I know this isn't a legal term of art, but I'd rather
 3    have the full meal deal on appeal.  And so I'd rather have all
 4    the issues to appeal, rather than have to appeal them
 5    piecemeal.
 6          But since the obesity issue is such a significant issue in
 7    this case, as you described it, the gravamen of the case, it
 8    just doesn't make sense to try the knee and back and then
 9    appeal on the obesity issue, only to -- if we're -- if we're
10    correct in our analysis, to come back and retry the obesity
11    issue.  And if we lose on the back and knees then -- and, you
12    know, if we go to trial on the back and knees, Your Honor,
13    there's an empty chair sitting in this room.  And it's called
14    obesity.  And, you know, BNSF can point to, you know, we can do
15    whatever we want because of obesity.  And it really -- it seems
16    to me to be an incredible, I guess, burden for the plaintiff to
17    bear and go to trial on that issue.
18          THE COURT:  Well, let's just lay this out.  If you go
19    to trial and you win, you have a judgment.  You appeal to the
20    Ninth Circuit on the BMI question.  That's capable of being
21    done in -- I used to say 60, but now we'll say 90 days.  You're
22    going to have to appeal within 14 days of the entry of
23    judgment.  So that doesn't seem like any prejudice to you,
24    because now at least you'll have some money to finance your
25    appeal.
```

Taylor v. BNSF, 3/2/16

1       On the other hand, if you try the case and you lose, then

2   you're taking up both issues at the same time.  Where am I

3   going wrong here?

4           MR. STEPHENS:  Because the way that the decision has

5   played out so far in terms of your entering summary judgment

6   is -- places the Taylors into a position of taking a position

7   at trial that could potentially jeopardize their arguments on

8   appeal, in order to prevail on the knees and back.  And we feel

9   that the obesity issue is the lion's share of this case.

10      And whether we go to trial -- and if we go to trial on the

11  knee and back, I'm sure that capable attorneys, like BNSF has,

12  would argue that, well, you got your judgment, and the judgment

13  came out of the same operative facts, so the issue is moot now,

14  and so you don't get to go back and appeal the obesity issue

15  and now come back down and say -- and I'm just speculating that

16  that's what they would argue.  But I could see that argument

17  being made.  And I would rather have my entire case on appeal

18  and -- or if I can't have the entire case on appeal, then to

19  take the permissive appeal and get the obesity issue resolved,

20  because that's the driver in this case.

21          THE COURT:  Mr. Stephens, I mean, I think I just

22  heard a plea for me to grant the motion for summary judgment,

23  not to put you on the spot.

24      Let me hear from Burlington Northern.

25          MS. PIERCE:  Your Honor, we have not heard this

Taylor v. BNSF, 3/2/16

```
 1    argument before and so haven't had an opportunity to discuss
 2    with our client the issue, although we would put before this
 3    Court that we also heard a plea for granting summary judgment,
 4    and we certainly agree that obesity is the lion's share of the
 5    case.  That's not to say that plaintiffs haven't made a claim
 6    for knees and back.  We certainly agree it's the much lesser
 7    issue in this case.
 8        We do think that summary judgment should be awarded in our
 9    favor on that knee and back issue, which would resolve
10    plaintiffs' concerns, apparently, about appeal, but would also
11    be the right ruling on the facts of this case.
12        If this Court were going to entertain potential
13    interlocutory appeal, we would appreciate an opportunity to
14    confer with our client and provide a limited briefing to the
15    Court with our client's position.
16            THE COURT:  I don't think that it is politically
17    incorrect that the 800-pound gorilla -- is that still all
18    right?  I think it is.  It seems to me that the 800-pound
19    gorilla in this case is the question of why don't you all go
20    out in the hall and settle knee and back, and leave open the
21    question of body mass to take up to the circuit.  I make it a
22    rule never to suggest settlement, because I like trials, and I
23    think that's why we're here.  And many years this Court has
24    more trials than the rest of my colleagues put together.  So
25    let me just throw that out there.
```

Taylor v. BNSF, 3/2/16

```
1        My recollection of appellate procedure is it's such that
2    you could settle a portion of this and stipulate that you're
3    keeping alive the portion you want to appeal.  That might be
4    another alternative.  And I'm not going to recommend it, but I
5    simply note that it exists.
6        Mr. Stephens, I hear you.  Let me give some thought to it.
7             MR. STEPHENS:  Thank you, Your Honor.
8             THE COURT:  I just can tell you, if there's any
9    conceivable way to get this up there once, I really do not want
10   to separate these issues of knee and back, because you're never
11   going to be back here -- actually, you could be back here, but
12   I won't be here.
13            MR. STEPHENS:  Why is that, Your Honor?
14            THE COURT:  I go senior in June.
15            MR. STEPHENS:  Oh, does that mean you no longer sit
16   on the bench or hear cases?
17            THE COURT:  Well, your friend, Judge Pechman, for
18   example, has been skiing in Tahoe now for the last month.
19   She's been senior for one month.
20            MR. STEPHENS:  I want that job.
21            THE COURT:  Should I go any farther than that?
22            MR. STEPHENS:  I get it.  I get it, Your Honor.
23            THE COURT:  Regardless of your view of Justice
24   Scalia, his untimely death was untimely because my status as a
25   senior judge means I'm going to be here for a long time waiting
```

Taylor v. BNSF, 3/2/16

```
1    for a replacement.
2          So anyway, we're getting off the beaten track.
3          Counsel, pencils to the ready, I'm going to go through
4    these fairly quickly.  If you have any of them that you want to
5    come back and revisit by saying, "Judge, could you be a bit
6    more expansive on your ruling," I'm happy to do that.  But
7    basically, the rulings are pretty straightforward.
8          Let me take the Taylors' motions in limine first.
9    Evidence of collateral source unemployment benefits.  I am
10   granting that motion.  The rule clearly is that unemployment
11   benefits are acceptable.
12         In this instance, the counter to that seems to be that
13   Mr. Taylor's unemployment benefits and back pay award would not
14   be compensation from the same injury, because Mr. Taylor
15   voluntarily quit his previous job.  I don't agree with that.
16   Mr. Taylor's decision to quit his previous job caused an
17   initial period of unemployment.  And it was Burlington
18   Northern's conduct, assuming the truth of the Taylors'
19   allegations, which caused Mr. Taylor to remain unemployed.  So,
20   the collateral source rule applies in this case, in my mind.
21         Burlington then argues, based on a dissenting opinion from
22   Justice Sanders, that unemployment benefits are admissible to
23   show failure to mitigate.  That's not going to fly with me.
24         Further, I think under 403 this line of ruling is correct
25   as the Court is making it, as opposed to as urged by Burlington
```

Taylor v. BNSF, 3/2/16

1   in its opposition.

2        Number 2, reference to Mr. Taylor's Marine Corps medical

3   file.  I'm going to grant that in part and deny it in part.

4   It's axiomatic that the only information available to

5   Burlington Northern at the time is what is relevant in this

6   case.  And since they didn't have the Marine Corps file, they

7   don't get to make mention of it.

8        This ruling does not prohibit Burlington Northern from

9   introducing evidence that the medical file was available to

10  Mr. Taylor at the time Burlington requested additional medical

11  information.  However, even in that circumstance, Burlington

12  may not introduce the contents of this file to show that it

13  acted reasonably.

14       There's a caveat to this.  And since I haven't seen the

15  file, I don't know if it's going to be applicable or not.  But

16  Burlington Northern may be able to show something that's in the

17  medical file for the limited purpose of showing Mr. Taylor's

18  struggles with his weight might be an alternative source of

19  emotional distress.  That's going to require me to do the

20  balancing test under 403; and therefore, I direct that if

21  Burlington Northern wants to do that, that they give the Court

22  prior notice, and I'll hear a specific discussion of the

23  prejudice and relevance at that time.

24       Dr. Jarrard's proposed expert testimony.  This is just a

25  terrible motion that comes up over and over again.  We most

1   recently had it in a medical malpractice action against the VA.

2   And that is, what do you do when you have a witness who is

3   going to necessarily give expert witness opinion testimony as

4   part of their percipient witness testimony?  And I have

5   resolved it the best that I can by the rule that the witness is

6   able to testify about the things that are part of their job

7   description.

8       And so if, for example, a doctor perceives, you know,

9   physical condition one, physical condition two, physical

10  condition three, and from those observations says, "It's my

11  opinion that it constituted an appendix," they're permitted to

12  do that without an expert opinion report.

13      On the other hand, I not infrequently find that people try

14  and push that to have someone who is a physician testify as an

15  expert outside the areas of what they did in the underlying set

16  of facts, and I do not allow that.

17      The other part of this that I had some difficulty with is,

18  most of Dr. Jarrard's testimony that you all talk about deals

19  with his opinions about the health and occupational risks

20  associated with obesity.  And since obesity is not any longer

21  in this case, it seems to me none of that is relevant anyway;

22  so I'm not sure that this motion was perhaps as important as it

23  once was.

24      But it certainly is permissible for him to testify -- this

25  is Dr. Jarrard, testify his experience, his role at Burlington

Taylor v. BNSF, 3/2/16

1   Northern, Burlington Northern's policies related to medical

2   screening, and why he acted in the way that he did in

3   Mr. Taylor's case.

4        Number 4, the Taylors move to prevent argument that

5   Mr. Taylor received the Department of Veterans Affairs'

6   disability determination on the date on which the disability

7   determination was written.  I'm going to deny that motion.

8        Burlington Northern is entitled to cross examine

9   Mr. Taylor regarding when he received -- you all call it the

10  VADD, so I guess I'll adopt your shorthand -- and, if

11  appropriate, to offer his prior testimony as impeachment.

12  Burlington is permitted to argue that the jury should interpret

13  the date on the face of the VADD in a particular manner, and to

14  point out inconsistencies in Mr. Taylor's testimony.  The Court

15  is confident that Mr. Stephens is going to be able to counter

16  those so the jury will have a full record before it.

17       An easier one, Number 5, exclude the contents and findings

18  of the VADD.  I am granting that for the same reason that I

19  denied admissibility mostly -- admissibility of the Marine

20  Corps medical file.  That's simply -- they didn't have it at

21  the time they made these decisions; and therefore, the contents

22  of it are irrelevant.  That doesn't somehow cancel the Court's

23  prior ruling on the date that it was issued.

24       Number 6, ask that Burlington Northern be prevented from

25  mentioning that Mr. Taylor has subsequently been diagnosed with

Taylor v. BNSF, 3/2/16

1   sleep apnea.  I'm going to grant that.  That's a later

2   diagnosis and treatment for sleep apnea.  I'd also note that

3   sleep apnea was relevant only to the obesity claim, which is

4   now gone.

5       Number 7, exclude evidence of the condition of

6   Mr. Taylor's knees and back that was not known -- not known --

7   to Burlington Northern at the time of the events in question.

8   Along the same lines as my prior ruling, the conditioning of

9   Mr. Taylor's knees and back that Burlington Northern was not

10  aware of at the time in question does not subsequently become

11  relevant.

12      Number 8, exclude the EEOC conciliation/mediation efforts

13  or the contents of those discussions.  I'm granting that.  The

14  Court excludes evidence of the EEOC conciliation and mediation.

15  This ruling does not apply to Burlington Northern's letters to

16  the EEOC that are the subject of its own Motion in Limine

17  Number 7.  That's one where a limiting ruling from the Court

18  may well be appropriate, and we know we're going to get into

19  it.  Tell me ahead of time, and we'll discuss the form of that

20  ruling.  Or if you want to create your own, take a look at the

21  federal rules -- or excuse me -- the model jury instructions.

22  There's one in there.

23      When I was in private practice, I never believed those

24  limiting instructions were worth a darn.  I've been pleasantly

25  surprised, talking to jurors afterwards, that they really do

Taylor v. BNSF, 3/2/16

```
1    try hard to compartmentalize that material.

2         Getting fairly far afield, exclude mention of Ron and

3    Robin Taylor's marital counseling.  Burlington Northern's

4    response is -- yeah, nice try.  I'm going to grant the motion.

5         If Burlington Northern chooses, it may inquire into why

6    Mr. Taylor's parents recommended marriage counseling.  That

7    line of questioning is relevant to how serious Mr. Taylor's

8    parents perceived their son's distress to be.  The fact that

9    Ron and Robin Taylor went to marital counseling themselves is

10   about as irrelevant as can possibly be.  I'm not even sure how

11   it got into this case.

12        Number 10, exclude evidence of Angelina Taylor's bariatric

13   surgery, estrangement from her family, prior divorce, or prior

14   abusive relationship.  Sometimes you call it "relationship" in

15   the singular, sometimes you call it "relationships" in the

16   plural, so I'm not sure which it is.

17        If the plaintiff chooses to raise a claim for emotional

18   distress, it is appropriate for the Court to allow the

19   defendants to introduce evidence of alternative or multiple

20   causes of such distress.  For that reason, I am going to deny

21   the motion excluding the evidence.

22        I will tell you that I'm going to keep you on a very short

23   leash on this.  There's a very big number for emotional

24   distress damages in this case.  To the extent that that's --

25   becomes a battleground, then more may well be permitted.  But
```

Taylor v. BNSF, 3/2/16

1    by and large, it's just not necessary or appropriate.  And it

2    also has -- is just rife with 403 problems.

3         To the extent that Burlington Northern believes it is

4    going to get into that area, it is directed to alert the Court

5    and the Taylors with advance notice, that during the course of

6    examination of this witness, this topic is going to come up.

7    We can try and get some ground rules established at that time.

8         That completes the Taylors' motions in limine.  Any

9    questions from the parties?

10        I guess, Mr. Stephens, I'll ask you first.

11             MR. STEPHENS:  No questions, Your Honor.

12             MS. PIERCE:  None, Your Honor.

13             THE COURT:  These are Burlington Northern's motions

14   in limine.

15        The first one is to exclude all testimony and reports of

16   Dr. Roehlling.  That's easy.  He's gone, and therefore it's

17   moot, so I'm denying it as moot.

18        Number 2, exclude evidence that Burlington Northern should

19   have engaged in the interactive process or offered Mr. Taylor a

20   reasonable accommodation.  I'm going to grant that motion.

21        Employers have no duty to engage in the interactive

22   process or offer reasonable accommodations for perceived

23   disabilities as opposed to actual disabilities.  The cite for

24   that is *Clipse vs. Commercial Driver Services*, 38 P.3d 464.  It

25   comes from the Washington Court of Appeals and can be found on

Taylor v. BNSF, 3/2/16

1   Page 473, at Note 8.

2           MR. STEPHENS:  Your Honor, I don't want to -- I'm not

3   trying to argue with your ruling here.  I just need some

4   clarification, because we're not going to argue that they

5   should have engaged in the interactive process.  But as we

6   cited in our briefing, Dr. Jarrard did say that when he wrote

7   the letter, he considered that to be part of the interactive

8   process.  And our argument was going to be that that relates to

9   his perception that Mr. Taylor had a disability.

10          THE COURT:  Interestingly, the Court expresses no

11  opinion on whether Dr. Jarrard's testimony regarding Burlington

12  Northern's efforts to engage in an interactive process is

13  admissible.  The reason is that the motion before me does not

14  include this particular question; and therefore, the Court does

15  not rule on it at this time.

16      I might ask the question, however, which we've already

17  spent a lot of time discussing, Dr. Jarrard's testimony, to the

18  extent that it's been available to us, all goes to BMI.  And in

19  this particular portion of his deposition, the discussion is

20  about BMI, and not about knee and back.

21      So I'm not sure how, in terms of a relevancy objection,

22  that's going to make it in.  I'm just -- me trying your case

23  for you.

24          MR. STEPHENS:  I'll be able to get some sleep, then,

25  Your Honor.

Taylor v. BNSF, 3/2/16

```
1              THE COURT:  Mr. Stephens, I'm going to turn to one of
2    your favorites here.  Burlington Northern asked the Court to
3    exclude evidence and argument regarding Montana state law.
4         My sidekick, Mr. Baris, here, is a proud "Montanian" or
5    "Montanan"?
6              MR. BARIS:  "Montanan."
7              THE COURT:  And regularly discusses the wisdom of
8    their state supreme court, if they have one.
9         The second part of that is Judge Pechman's rulings in EEOC
10   vs. Burlington Northern -- I won't give you the case number,
11   since I assume you all know it -- and other jurisdictional laws
12   regarding obesity and paying for sleep studies.  I am granting
13   that motion.
14        Case law and statutory law from other jurisdictions is not
15   relevant to this case, and discussion at trial would serve only
16   to confuse the issues and waste time.  Similarly, the Court
17   does not permit evidence or argument regarding case law from
18   other jurisdictions.
19        You all are welcome to put in jury instructions based on
20   other states' case law and argue to me that that's what the law
21   is in Washington or should be in Washington.  As part of my
22   usual speil, I will tell you that I disregard all case law
23   authority from Arkansas.  You know, stick to the Ninth Circuit,
24   and stick to Washington law to the extent you can.  That's what
25   I'm supposed to be doing.
```

Taylor v. BNSF, 3/2/16

```
1        The Court excludes prior testimony regarding Burlington
2   Northern's actions and policies related to using BMI as an
3   employment criteria.  That testimony is relevant only to claims
4   the Court has dismissed.
5        Finally, the Court provisionally excludes evidence or
6   argument about other cases in this district.  The Taylors have
7   simply provided the Court with a copy of Judge Pechman's
8   opinion in EEOC vs. Burlington Northern, but have not shown
9   that Judge Pechman's ruling is applicable under Washington law.
10       Further, the Court questions whether that ruling, even if
11  applicable under Washington law, is still relevant in this
12  case.  Burlington Northern asked Mr. Taylor to pay for several
13  post-offer tests.  However, those tests appear to be related to
14  his weight, not his knees and back.  And as I've already told
15  you, questions regarding his weight are not going to be
16  permitted in the trial.
17       Number 4, exclude evidence of testimony -- or exclude
18  testimony of evidence regarding other claims against Burlington
19  Northern or lawsuits against Burlington Northern.  I'm granting
20  that.
21       The Taylors' response indicates that they intend to
22  introduce evidence of other discrimination claims against
23  Burlington Northern.  They don't inform the Court what claims
24  those are, but they imply or suggest that the claims involve
25  obesity discrimination.  Such claims are irrelevant following
```

Taylor v. BNSF, 3/2/16

1   the Court's dismissal of the Taylors' obesity determinations.

2        It sounds from your description of the opposition to this

3   motion that it really is seemingly an introduction of character

4   evidence, which the Court would generally exclude under 404(b).

5   If the Taylors feel that there is some claim that is relevant,

6   they can certainly raise that issue with the Court, but I would

7   require you to do that outside the presence of the jury.

8        Number 5, exclude argument or evidence regarding

9   Burlington Northern's BMI standards before January 1, 2007, and

10  after June 30, 2008.  It's granted.  Those are not part of the

11  case; and therefore, they are irrelevant.

12       Number 6, arguments or evidence regarding Burlington

13  Northern's BMI standards for positions other than electronic

14  technician.  Once again, I'm granting that motion, because we

15  just dismissed the obesity claims.

16       Exclude -- this is Number 7.  Exclude argument or evidence

17  regarding the EEOC investigation, statements made therein, and

18  the outcome of the investigation.  The Court grants this in

19  part and denies it in part.

20       The Taylors do not respond to Burlington Northern's

21  request to exclude information about the EEOC investigation,

22  other than Burlington Northern's letters to the EEOC.  As such,

23  the Court grants Burlington Northern's motion as regards the

24  other aspects of the EEOC investigation.

25       I believe I've already indicated to you that I'm going to

1    allow the use of the two letters.  Whether the recision

2    language in the first letter resulted from an honest mistake or

3    reflected the reality of the situation is an issue for the

4    jury.  As the Taylors point out in their opposition and their

5    response to the motion for summary judgment, the record

6    contains evidence from which the jury could find the conclusion

7    of either honest mistake or reality; and therefore, I'm going

8    to allow it to be presented to the jury.

9        Number 8, exclude the damages exhibit prepared by

10   plaintiffs' counsel; B) any claim for future damages; and C)

11   lost fringe benefits in the form of insurance premiums and

12   medical expenses.  I'm going to take these each at a -- one at

13   a time, although I'm going to end up ultimately granting all

14   three of them.

15       The first is the damages exhibit prepared by plaintiffs'

16   counsel.  It apparently is being offered as substantive

17   evidence.  And as such, it's hearsay.  That doesn't mean that

18   Mr. Taylor can't testify about how much money he has made since

19   2007, nor does it prevent the introduction of Burlington's

20   discovery responses regarding Mr. Taylor's hypothetical

21   earnings, provided a proper foundation is laid and the evidence

22   is otherwise admissible.  The ruling does not prevent counsel

23   from arguing from such evidence about the difference between

24   what Mr. Taylor would have earned and, in fact, did earn.

25       The more difficult question for me is -- because it's not

Taylor v. BNSF, 3/2/16

1    characterized this way -- is if this was intended to be some

2    kind of demonstrative.  And first off, I don't allow

3    demonstratives to go back into the jury room if they're not

4    exhibits.  I would urge you to look at Federal Rule of

5    Evidence 1006, which discusses the difference between evidence

6    and -- I love the use of charts as a pedological device.

7         You may well help yourselves if you take a look at this

8    ahead of time, decide what it is, and if you have an objection

9    to it, and also if you can get the testimony that it needs to

10   be based on in at trial.  If you can do all those things, then

11   you're going to be able to use it.  Otherwise, it's going to be

12   excluded.

13        Number 2 is the motion excluding evidence and argument on

14   front pay or future wage loss.  Burlington Northern asked the

15   Taylors to identify the components of their claimed damages on

16   multiple occasions.  Burlington Northern's state court demand

17   for a statement of damages asked what amounts the Taylors

18   claimed in special damages, including what amounts they claimed

19   in wage loss and future wage loss.  The Taylors argue that they

20   were not required to break down special damages into

21   Burlington's proposed categories.  However, their response does

22   not simply state an amount of special damages.  Instead, the

23   response provides a category for special damages and then

24   breaks that category down into wage loss and total special

25   damages.  Given the form of the question as originally asked, a

1   reasonable person would understand the Taylors were not

2   claiming future wage loss.

3       The Taylors' conduct since returning to federal court has

4   likewise indicated they do not claim future wage, lost wages,

5   or front pay.  An August 2015 interrogatory asked the Taylors

6   to identify each and every component of loss or damage claimed.

7   The Taylors first responded that they were in the process of

8   obtaining actual data to calculate "the actual amount of

9   Mr. Taylor's wage loss."  They later supplemented that response

10  with the wage loss calculation document that we've already

11  discussed.  However, nothing in the wage loss calculation

12  indicates that future wages, or front pay, are included in the

13  lost wages the Taylors are claiming.  Thus, despite Burlington

14  Northern's request for each and every component of damages, the

15  Taylors' responses provide no hint of future damages.

16      Finally, the Court notes that in his deposition,

17  Mr. Taylor stated that the wage loss calculation document

18  contained all of Mr. Taylor's claimed damages.  "Are there any

19  damages that you're claiming that are not on this piece of

20  paper?"  Answer:  "No."  Because Burlington Northern requested

21  information on future wage loss or front pay, and the Taylors

22  failed to disclose that they were claiming such damages, the

23  Court excludes any evidence or argument on front pay for future

24  damages.

25      Finally, Part C, the Court grants Burlington's motion to

Taylor v. BNSF, 3/2/16

1   exclude testimony on out-of-pocket expenses for life, or health
2   insurance or medical expenses incurred as a result of not
3   having coverage provided by Burlington Northern.  The Taylors
4   do not respond to this portion of Burlington Northern's motion;
5   and therefore, I believe they're in agreement with that ruling.
6        Number 9 requires me to ask you a question, which --
7   without attempting to sound flip, where in the world is Tom
8   Smith?
9             MR. STEPHENS:  Your Honor, if I knew where Tom Smith
10  was, I would be trumpeting it loud to Ms. Pierce so she could
11  take a deposition.  At this stage, we're not going to be
12  calling Mr. Smith, because we can't find him.
13            THE COURT:  All right.  Well, then that makes that
14  one easy.  If that changes, let me know.
15            MR. STEPHENS:  I will, Your Honor.
16            THE COURT:  Now, Number 10, exclude testimony and
17  argument or evidence regarding the cost of a sleep study.  I'm
18  going to grant that motion.
19       Nothing in the record connects the request for a sleep
20  study to Mr. Taylor's back or knee problems.  Rather, the
21  record shows that Burlington Northern requested a sleep study
22  because Mr. Taylor's BMI indicated that he was at risk of
23  developing sleep apnea.  Given that the Court has dismissed the
24  obesity-based disability claim, the cost of sleep study is
25  irrelevant; and therefore, I grant the motion.

Taylor v. BNSF, 3/2/16

1   And finally, evidence or reference to Burlington
2   Northern's size, or that it is owned by Berkshire Hathaway.
3   Mr. Stephens has a great response to this.  It has to do with
4   something about Burlington Northern being a federal contractor.
5   I guess that makes me an employee of a federal contractor.
6       I'm going to grant this motion.  This is a disparate
7   treatment action brought exclusively under state law.  Neither
8   Burlington Northern's status as a federal contractor nor its
9   size and resources are relevant to this case.  Moreover, to the
10  extent the information is relevant, its probative value is
11  substantially outweighed by the danger of unfair prejudice, and
12  under the rules of evidence, I would exclude it.  Therefore,
13  I'm going to grant that motion.  As a caveat, if in some manner
14  Burlington Northern puts its size or the extent of its
15  resources at issue, the plaintiffs are free to raise the matter
16  again.
17      I would finally add that I read in the paper, as I was
18  flying back to Seattle yesterday, that Berkshire Hathaway has
19  offered some $1 million prize to its employee who gets the best
20  results in the NCAA basketball pool.  I'm excluding that also.
21          MR. STEPHENS:  And I take it they won't let me apply
22  for that pool, huh?
23          THE COURT:  I'm not sure.
24      Mr. Olsen, are you in-house or --
25          MR. OLSEN:  No, Your Honor.

Taylor v. BNSF, 3/2/16

```
 1            THE COURT:  Too bad.  You're losing out on your
 2   chance.
 3            MR. OLSEN:  That's right.
 4            THE COURT:  Counsel, anything further I can do to
 5   ruin your weekend here?
 6            MR. STEPHENS:  One issue, Your Honor -- and I
 7   apologize.  I forget the name of the gentleman that called me
 8   on Friday to enlighten me about the local rules and the
 9   highlighting issue, because there was some -- was that you?
10   Okay.  And --
11            THE COURT:  Does anyone read the local rules?
12            MR. STEPHENS:  I did, Your Honor.  I completely
13   messed up when I read it.  And then when I reread it after we
14   created this fiasco, I kind of was sitting there with egg on my
15   face.  And I was hoping it would go away, but it just seems to
16   resurface.
17       I received the objections from the defense yesterday, per
18   our agreement.  In light of the timing of me getting back to
19   the office, I'm going to have to send those out to get copied,
20   and so I would like to have until close of business tomorrow to
21   get those back up to you.  Is that going to be --
22            THE COURT:  The problem for me is, I have to read
23   them and rule on the objections.  And if you were one of the
24   cases that's theoretically, you know, teed up for Monday, the
25   answer is, it will be a long night, since you've done an
```

Taylor v. BNSF, 3/2/16

1    all-nighter.  But since you're the week after that, you can

2    have until close of business tomorrow.

3              MR. STEPHENS:  Thank you, Your Honor.

4              THE COURT:  Please read those rules.  I mean, that

5    one in particular, for some reason -- maybe it's not in the

6    right place, although I think it's in the local rule on

7    depositions -- is just constantly ignored.  Or alternatively,

8    the one party highlights its proposed testimony in green, which

9    is black when it comes through the copier; and therefore, I

10   have no idea what it is they want to have read.  But it's --

11   it's actually a very convenient system.  It works pretty well,

12   but you've got to read it to have it be triggered.

13        Anything else, Mr. Stephens?

14             MR. STEPHENS:  No, Your Honor.

15             THE COURT:  All right.  Anything else?

16             MS. PIERCE:  Nothing for us, Your Honor.

17             THE COURT:  If you want to take me up on my offer to

18   actually talk to one another, talk to Casey.  If you want to

19   play with the stuff for a half hour, 25 minutes -- Casey, are

20   we done for the day?

21             THE CLERK:  Yes.

22             THE COURT:  The only thing that's going to give you

23   any trouble about technology is that exhibits are up, they're

24   shown to the witness, they're shown to me, they're shown to

25   opposing counsel -- actually, they're shown to the audience on

Taylor v. BNSF, 3/2/16

1   those screens that are behind you -- but the jury doesn't see

2   them.  And for some reason, we are organically incapable of

3   doing that.  They always show up immediately on the jurors'

4   screen, and then the jury all squeaks over, "I'm sure we're not

5   supposed to be seeing this."

6        It's not anything we control.  You control it, which is a

7   bad design feature for this equipment.  If it was us, we'd do

8   it much better.

9        Other than that, Counsel, you will be the first to know if

10  there's any movement in our trial schedule.  Other than that,

11  thank you for your help, and we'll be in recess.

12                        (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

Taylor v. BNSF, 3/2/16

1                    C E R T I F I C A T E

2

3

4

5          I, Andrea Ramirez, RPR, CRR, Court Reporter for the

6    United States District Court in the Western District of

7    Washington at Seattle, do hereby certify that I was present in

8    court during the foregoing matter and reported said proceedings

9    stenographically.

10         I further certify that thereafter, I have caused said

11   stenographic notes to be transcribed under my direction and

12   that the foregoing pages are a true and accurate transcription

13   to the best of my ability.

14

15

16         Dated this 4th day of March, 2016.

17

18                         /s/ *Andrea Ramirez*

19                         Andrea Ramirez
                           Official Court Reporter
20

21

22

23

24

25